McKESSON CORPORATION; Foremost Tehran, Inc.; Foremost Shir, Inc.; Foremost Iran Corporation; Overseas Private Investment Corporation, Appellees/Cross–Appellants,

v.

ISLAMIC REPUBLIC OF IRAN, Appellant/Cross–Appellee.

Nos. 93–7167 & 93–7168.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1995.

Decided April 14, 1995.

Thomas G. Corcoran, Jr. argued the cause for appellant/cross-appellee. With him on the briefs was Henry M. Lloyd.

Mark R. Joelson and Mark N. Bravin argued the cause and filed the briefs for appellees/cross-appellants. Joseph P. Griffin entered an appearance.

Before: HENDERSON, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

These are interlocutory cross-appeals from the judgments of the district court rendered on remand from our decision in *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C.Cir.1990). Iran's appeal presents two issues regarding its immunity under the Foreign Sovereign Immunities Act of 1976 (FSIA), Pub.L. No. 94–583, 90 Stat. 2891 (1976) (codified in part at 28 U.S.C.

§§ 1330, 1391(f), 1602–1611). The first is whether, as the district court ruled on remand and as we determined in Iran's 1990 interlocutory appeal, the complaint alleges a sufficient "direct effect in the United States" to deprive Iran of immunity under FSIA § 1605(a)(2). We hold that the law of the case applies and therefore refuse to reconsider our earlier decision. Iran's second issue is whether, as the district court found, the evidence establishes a principal-agent relationship between Iran and its codefendants with respect to the alleged interference with and taking of McKesson's shareholder rights in a dairy company in Iran. On this subject, we sustain the district court's finding. McKesson and the Overseas Private Investment Corporation (OPIC) appeal from the district court's judgment refusing to impose certain sanctions on Iran for its failure to comply with discovery requests. Because the court's judgment is not a final order, it is not subject to interlocutory review. We therefore dismiss McKesson's and OPIC's appeal for lack of appellate jurisdiction.

I

A

McKesson Corporation is a Maryland corporation with its principal place of business in California. In 1959, at the request of a group of Iranian citizens, McKesson agreed to assist in establishing a dairy, the Sherkat Sahami Labaniat Pasteurize Pak ("Pak Dairy") in Iran. McKesson's amended complaint alleges that it agreed to furnish "one-half of the required capital, and all the necessary management skills and personnel, engineering data, sources of material, procurement services, ingredients, and packaging. Through separate agreements, McKesson agreed to provide technical assistance as needed, and licensed its trademarks in exchange for receipt of royalties." Between 1959 and 1979, McKesson provided the top management for the dairy, and controlled its board of directors. In 1979, McKesson—or Foremost–McKesson, Inc., as the company was then called—held 31 percent of the equity interest in Pak Dairy.

The following text and footnotes 1–6 describing what then transpired are taken from our earlier opinion. "On January 22, 1982, [McKesson] and the Overseas Private Investment Corporation[1] filed a complaint in the District Court against Iran and several agencies and instrumentalities of Iran through which [McKesson] claims Iran acted. These agencies and instrumentalities included the Financial Organization for the Expansion of Ownership of Productive Units, the National Investment Company of Iran, [Bank of Industry and Mine], the Foundation for the Oppressed and Pak Dairy. The complaint alleged that Iran, acting through the codefendant agencies and instrumentalities, illegally divested [McKesson] of its investment in Pak Dairy. [McKesson] and OPIC sought compensation for the entire value of their jointly held 19.84% insured equity interest in Pak Dairy,[2] allegedly valued at not less than $7,040,000, plus interest; compensation for their share in any dividends declared and not received before the alleged divestment of their equity interest; and various other damages, including attorneys' fees. *See* Complaint ¶¶ 38–39, *reprinted in* Appendix ('App.') 36.

"On June 29, 1982, Iran responded to the complaint in what it titled an 'Answer to Complaint.' *See* Answer to Complaint [hereinafter 1982 Answer], *reprinted in* App. 46. In this response, Iran did not state the defenses raised in its motion to dismiss and did not admit or deny [McKesson]'s averments, *cf.* Fed.R.Civ.P. 8(b); rather, Iran contended that prosecution of the suit was barred by the so-called Algiers Accords of January 19, 1981,[3] and that, pursuant to Executive Order No. 12,294, 46 Fed.Reg. 14,111 (1981) ('Executive Order'), the 'complaint ha[d] no legal effect other than to toll the applicable statute of limitations.' 1982 Answer at 1, *reprinted in* App. 46.[4] Pursuant to the terms of the Executive Order, the District Court took no action in this case while [McKesson] and OPIC presented their claims against Iran to the Iran–United States Claims Tribunal ('Claims Tribunal') in The Hague.

"On April 10, 1986, the Claims Tribunal concluded that interference with [McKesson]'s rights had not, by January 19, 1981, amounted to an expropriation. *See Foremost Tehran, Inc. v. Islamic Republic of Iran*, 10 Iran–United States Claims Trib.Rep. 228, 250, *reprinted in* App. 78.[5] However, the Claims Tribunal concluded that Pak Dairy had unlawfully withheld from [McKesson] cash dividends declared in 1979 and 1980, and it therefore awarded [McKesson] approximately $900,000, plus interest, against Iran. The Claims Tribunal also concluded that Pak Dairy unlawfully failed to deliver to [McKesson] stock certificates representing stock dividends declared in 1980 and that Pak Dairy had breached contractual obligations in failing to pay rental payments due and to return upon demand certain machines to [McKesson]. The Claims Tribunal awarded [McKesson] in excess of $500,000 in damages against Pak Dairy for the contract breaches. *See id.* at 257–58, *reprinted in* App. 88. Iran paid the amounts awarded out of the security account established at The

---

1. OPIC is an agency of the United States that insures private overseas investments of United States nationals.

2. [McKesson] sought damages only for the insured portion of its shareholding: 64% of its 31% ownership or 19.84% of the total shares.

3. Declaration of the Government of the Democratic and Popular Republic of Algeria, 20 Int'l L. Materials 224 (1981) [hereinafter Algiers Accords].

4. The Executive Order provided that plaintiffs with claims arguably within the jurisdiction of the Claims Tribunal could file suit in federal court in order to toll the period of limitations for commencing the action. *See* 46 Fed.Reg. at 14,-111. The Executive Order "purports only to

'suspend' the claims, not divest the federal court of 'jurisdiction.'" *Dames & Moore v. Regan*, 453 U.S. 654, 684, 101 S.Ct. 2972, 2989, 69 L.Ed.2d 918 (1981).

5. A claim must have been "outstanding" on January 19, 1981, to fall within the jurisdiction of the Claims Tribunal. *See* Algiers Accords, *supra* note 3, at art. II, ¶ 1; *see also Foremost Tehran, Inc. v. Iran*, 10 Iran–United States Trib.Rep. at 233 n. 5, *reprinted in* App. 54 n. 2. The parties apparently dispute whether the Claims Tribunal's determination in favor of Iran on the expropriation claim was based on the merits or on lack of jurisdiction. However, that issue is not before us in this appeal, and accordingly, we do not address that issue.

Hague pursuant to the provisions of the Algiers Accords.

"On April 1, 1988, the plaintiffs—still seeking damages for claimed losses—revived this lawsuit by filing a motion for partial summary judgment against Iran on the issue of liability. The plaintiffs alleged facts that arguably support a conclusion that the dairy was expropriated *after* the 1981 limit to the Claims Tribunal's jurisdiction. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran*, Civ. Action No. 82–0220, slip op. at 2, 1989 WL 44086 (D.D.C. Apr. 18, 1989) ('*Foremost III'*), *reprinted in* App. 4.[6]

\* \* \* \* \* \*

"Concurrently, Iran filed a motion to dismiss the underlying complaint, pursuant to Rule 12(b)(1) and (2) of the Federal Rules of Civil Procedure, for lack of jurisdiction under FSIA. The District Court denied Iran's motion to dismiss. *See Foremost III*, Civ. Action No. 82–0220, 1989 WL 44086 (D.D.C. Apr. 18, 1989), *reprinted in* App. 3. Iran then filed this interlocutory appeal." *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d at 441–42.

### B

A foreign state is "immune from the jurisdiction of the courts of the United States and of the States" unless the foreign state's conduct falls within one of FSIA's exceptions. 28 U.S.C. §§ 1604, 1605–07; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). In our earlier ruling, we affirmed the district court's judgment that "the facts alleged by [McKesson] exhibit sufficiently direct effects to confer subject matter jurisdiction under the third clause of section 1605(a)(2)." 905 F.2d at 450.[7] McKesson had invoked the "commercial activity" exception contained in the third clause of § 1605(a)(2), which reads:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

(2) in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

After we remanded the case, the Supreme Court issued *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), interpreting § 1605(a)(2)'s commercial activity exception. Claiming that *Weltover* had undermined our ruling, Iran once again moved to dismiss the suit. The district court responded thus: "As McKesson suggests and the Court of Appeals has affirmed, the [district] Court's finding of a direct effect in the United States is fully supported by the evidence, regardless of any changes engendered by *Weltover*."

In our earlier decision, we also determined that the district court, in making its initial jurisdictional determination, had to make factual findings regarding the "degree of control exerted by Iran over Pak Dairy and over the shareholder entities that [McKesson] alleges are government controlled." 905 F.2d at 453. Unless "the relationship between Pak Dairy and Iran is one of principal to an agent," the actions of the codefendant entities could not be attributed to Iran, and § 1605(a)(2) would not deprive Iran of immunity from suit.

On remand from our earlier decision, the district court denied McKesson's motion to sanction Iran for failing to provide discovery. Although Iran's responses to the interrogatories and document requests "skirted close to the edge," Iran had not violated the court's discovery order or the Federal Rules of Civil Procedure. The district court therefore never passed on McKesson's claim that an ap-

---

**6.** The Supreme Court explained in *Dames & Moore*, 453 U.S. at 684–85, 101 S.Ct. at 2989–90, that, "[a]s we read the Executive Order, those claims not within the jurisdiction of the Claims Tribunal will 'revive' and become judicially enforceable in United States courts."

**7.** We also held that McKesson had satisfied the portion of § 1605(a)(2) requiring that its suit be based upon "an act" in Iran "in connection with a commercial activity" of Iran. 905 F.2d at 449–50. This holding is not involved in the present appeal.

propriate sanction would be a finding of subject matter jurisdiction.

## II

■ In order for us to rule for the second time on Iran's contentions regarding the direct effects portion of § 1605(a)(2), we would have to find some reason for not adhering to the law of the case doctrine. "When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735 (D.C.Cir.1995). One common reason for lifting this constraint is an intervening Supreme Court decision changing the law. *NTEU v. FLRA*, 30 F.3d 1510, 1516 (D.C.Cir.1994). Iran supposes that *Weltover* fits that mold.

■ Before *Weltover*, several courts, including this one, subscribed to the view that under § 1605(a)(2), direct effects must also be "substantial" and "foreseeable." The quoted terms appeared, not in the statute, but in a House Report on the bill that became the FSIA. Agreeing with a line of Second Circuit decisions, including *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 311 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), the Supreme Court in *Weltover* rejected "the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" 504 U.S. at 618, 112 S.Ct. at 2168. Even insubstantial effects qualify under § 1605(a)(2) so long as they are not "purely trivial." *Id.* Whether effects were foreseeable is beside the point. It is enough, the Court held, that the consequences of the defendant's activities followed immediately from those activities. *Id.* The effects then are "direct." The Court also decided that the effects in *Weltover* were "in the United States," as § 1605(a)(2) also required. Plain-

tiffs had satisfied this aspect of § 1605(a)(2) although they were foreign corporations holding Argentine bonds: the bonds were payable in the United States and Argentina's failure to honor this contractual commitment "necessarily had a 'direct effect' in the United States." *Id.* at 619.

There is no doubt that, as far as this circuit is concerned, *Weltover* changed the law. The question remains whether *Weltover* did so in a way that was material to the outcome of our previous ruling in this case. The significance of *Weltover* stemmed not from the Supreme Court's unremarkable equation of "direct" and "immediate," but from the Court's rejection of the additional requirements of foreseeability and substantiality this court and others, not including the Second Circuit, had engrafted on § 1605(a)(2)'s commercial activity exception. If our earlier decision in this case had been that the effects McKesson alleged were "direct" *because* they were foreseeable and substantial, *Weltover* would warrant reconsideration of our ruling. But that is not what we held in the first appeal. Our decision was that the following effects of Iran's alleged actions were "foreseeable, substantial *and* direct." 905 F.2d at 451 (italics added): the "constant flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging, between the United States and Iran to support the operation of Pak Dairy" came to a halt; and McKesson's role as an active investor ceased when the dairy's new directors, illegally installed according to McKesson, cut off all of the dairy's existing "commercial ties" with McKesson in the United States. *Id.*[8] *Weltover* rendered superfluous our discussion of why these effects were "foreseeable" and "substantial." But *Weltover* did not undermine our separate determination that these alleged effects were also "direct." In reaching that conclusion we relied on, and said we were "[a]dhering" to, the Second Circuit's decision in *Texas Trading*, the same case the Supreme Court cited with approval in *Welt-*

---

8. These were the "effects" the court determined were foreseeable, substantial and direct. McKesson's theory was not that Iran's calling a halt to the flow of capital, equipment and personnel breached any legal obligations, but that the stop-

page was a direct consequence of Iran's interference with McKesson's "rights to participate in the management of Pak Dairy" (*see, e.g.*, Amended Complaint ¶¶ 24, 26–30, 33–36).

*over.* 905 F.2d at 451.[9] Nothing in our prior opinion indicates that we believed "direct" meant anything other than immediate. In addition to *Texas Trading,* we relied upon *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1515 (D.C.Cir.1988), which held that the effect in the United States of a breach of contract abroad could not be "direct" under § 1605(a)(2) if the "effect is due to an intervening event." As the Tenth Circuit has recognized, *Zedan* is consistent with *Weltover. United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,* 33 F.3d 1232, 1239 & n. 6 (10th Cir.1994).

While *Weltover* changed the law by removing foreseeability and substantiality from consideration, it did not undercut the remaining reason we gave for applying the commercial activity exception of § 1605(a)(2)—that the effects were "direct." Because this portion of our prior opinion is unaffected by *Weltover,* it remains the law of the case, not subject to reconsideration in this second interlocutory appeal. What we wrote five years ago bears repeating: "We are not making a final determination whether jurisdiction exists under FSIA; nor are we making any final factual determinations. Rather we are addressing whether the District Court properly denied Iran's motion to dismiss." 905 F.2d at 440 n. 3. As before, we "find no infirmity with the District Court's determination that the alleged effects were sufficiently direct to survive Iran's motion to dismiss." *Id.* at 451.

### III

■ In the previous section we assumed that the alleged actions having a direct effect in the United States were attributable to Iran. Whether that assumption is correct is the second issue posed in Iran's appeal. We said in our earlier ruling that in order to deprive Iran of immunity, the district court had to find that Iran exercised "sufficient control ... over Pak Dairy to create a relationship of principal to agent." 905 F.2d at 447. While the FSIA applies both to instrumentalities and agencies of the foreign sovereign, and to the sovereign itself, there is a presumption that such entities and the sovereign are independent. *Id.* at 446, citing *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 626–27, 103 S.Ct. 2591, 2599–2600, 77 L.Ed.2d 46 (1983) *("Bancec").* "Iran's alleged control over Pak Dairy was exercised through entities on Pak Dairy's Board, which were in turn controlled by Iran. Thus, the alleged principal/agent relationship is not a direct one and, hence, the showing required to support a claim of attribution is far from straightforward." 905 F.2d at 448.

■ It would serve no useful purpose to recite in detail the extensive findings the district court issued on remand. We have reviewed those findings and have determined that they are well-supported. The Financial Organization for the Expansion of Ownership of Productive Units, the National Investment Company of Iran, the Bank of Industry and Mine, and the Foundation for the Oppressed were, the court found, organizations of the Iranian government. Together these government entities held 52 percent of Pak Dairy's stock and controlled six of the seven seats on its board of directors. Pak Dairy's board and its government shareholders forced the dairy to disregard its commercial mission and its duties to McKesson as a shareholder. In the words of the Financial Organization's Managing Director, who dominated and eventually chaired the board, Pak Dairy was no longer "a joint stock company" whose primary fiduciary duty was to its stockholders. Rather, "the profit of the people and the Government should also be considered" and "the main objective is ... to protect the interests of the country...." Iran's interest became the decisive factor in Pak Dairy's actions with regard to McKesson. Routine business decisions, such as declaring and paying dividends to shareholders

---

**9.** Relying on *Goodman Holdings v. Rafidain Bank,* 26 F.3d 1143, 1146–47 (D.C.Cir.1994), Iran claims that Pak Dairy's cash dividends were payable in Iran, not in the United States, and for that reason McKesson's failure to receive these dividends cannot be considered a § 1605(a)(2) "direct effect in the United States." But our earlier decision is controlling and it did not mention, as a direct effect, Pak Dairy's failure to pay cash dividends to McKesson. *See* 905 F.2d at 450–51.

and honoring the dairy's contractual commitments, were dictated by Iran through the Financial Organization and the other government representatives on Pak Dairy's board. In regard to Pak Dairy's denying dividends to McKesson, Iran's role was direct and manifest. The board deferred its decision to withhold dividends from McKesson so that "the representatives of the government firms would get in touch with their heads to find a probable solution to the problem." Hence Iran's Cabinet Ministers (and officials answerable to them) became involved in this decision-making process, as reflected by Pak Dairy's corporate records.

From this and other evidence, the district court properly found that:

> Upon recommendations by the board, the shareholders, a majority of which were government-owned, determined when to pay cash and stock dividends. The board decided that Pak Dairy would not pay any money to foreign shareholders, including McKesson. This extensive involvement in the day-to-day operations of Pak Dairy is evidence of a principal/agent relationship between Iran and Pak Dairy.

Iran argues that *"the principal ... must manifest in some manner that the agent is its agent."* Brief for Appellant at 30. Here, as the district court found, Iran did manifest its agency relationship with the co-defendants. That relationship was manifested generally through Iran's control over the management of the co-defendants and through a pattern of conduct and policy statements that caused "the agent[s] to believe that the principal desire[d] [them] so to act on the principal's account." RESTATEMENT (SECOND) OF AGENCY § 26 (1957). That conduct, as the district court described it, included rampant anti-American propaganda, expulsions of Americans and takings of American interests, which caused the government representatives on Pak Dairy's board to believe that Iran desired them to take these steps with regard to McKesson. And Iran's manifestation of assent to the denial of dividends to McKesson came from the highest levels of the Iranian government when the Pak Dairy board members sought approval from their agency heads before acting.

■ There is, in short, more than enough evidence to support the district court's finding that Iran had sufficient control over Pak Dairy to create a principal/agent relationship. We also conclude that the district court applied the correct legal standard in evaluating that evidence. The Supreme Court's *Bancec* decision, on which our earlier opinion relied, invokes attribution principles common to both international law and federal common law. 462 U.S. at 621–23, 103 S.Ct. at 2597–98. We have already mentioned the Restatement of Agency. In the international context, jurists and scholars recognize that when a state-controlled corporation implements state policies, its separate corporate existence does not shield the state from liability. *See, e.g., Case Concerning the Barcelona Traction, Light & Power Co. (Belg. v. Spain),* 1970 I.C.J. 4, 38–39 (February 5); Roberto Ago, *Third Report on State Responsibility,* [1971] 2 Y.B. INT'L L. COMM'N 199, 256, UN Doc. A/CN.4/246 and Add.1–3 (1971) (when the occasion arises, "the conduct of officials of [state] corporations or institutions must be regarded, at the international level, as 'acts of the State.'"); Aris Haigian, Note, *The Separate Entity Fiction Exposed: Disregarding Self–Serving Recitals of Juridical Autonomy in Nationalization Cases,* 6 FORDHAM INT'L L.J. 288, 303 (1982–83). Still, Iran may be correct that if a government corporation is simply carrying out a state commercial policy as a normal part of the corporation's mission, without any state involvement, the state should be insulated from the corporation's actions. Many of the cases Iran cites fall into this category. This case is far different. Here the governmental policy was not commercial. It was instead designed to injure some of the corporation's own shareholders and to do so through a corporate policy guided by government representatives.

The district court offered other grounds for finding that the requisite principal/agency relationship existed and for attributing Pak Dairy's actions to Iran, but we need not pass upon those portions of its comprehensive decision. What we have already recited is sufficient to support the court's ruling on re-

mand that the FSIA does not immunize Iran from a trial in this case.

## IV

This brings us back to McKesson's cross-appeal from the district court's order rejecting McKesson's motion for sanctions against Iran pursuant to Fed.R.Civ.P. 37(b)(2)(A). Although Iran had not been cooperative in responding to McKesson's interrogatories and document requests, the court did not believe Iran had violated its discovery order or the Federal Rules of Civil Procedure. Having found no violations, the court did not reach the question what sanctions would be appropriate.[10]

■ Orders refusing to find discovery violations, like other discovery orders, are interlocutory. They do not finally end the litigation. They are generally reviewable after final decision. If the final decision is favorable to the movant, they may never become the subject of an appeal. For these reasons and others, discovery orders are not usually appealable until the litigation has finally ended. *See, e.g., Reise v. Board of Regents,* 957 F.2d 293, 295 (7th Cir.1992); *Uehlein v. Jackson Nat'l Life Ins. Co.,* 794 F.2d 300, 302 (7th Cir.1986); *Atlantic Richfield Co. v. United States Dep't of Energy,* 769 F.2d 771, 780 n. 62 (D.C.Cir.1984).

■ The parties argue about the merits of the court's discovery order without pausing to tell us why we have appellate jurisdiction over it. They must be assuming that our jurisdiction over Iran's interlocutory appeal from the court's denial of its motion to dismiss gives us jurisdiction over McKesson's cross-appeal. This does not follow. The district court's order denying Iran's motion to dismiss falls within the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949), because Iran's sovereign immunity is an immunity from trial. 905 F.2d at 443. The discovery order does not qualify for such treatment. It is not independently appealable. A "rule loosely

allowing pendent appellate jurisdiction," the Supreme Court warned, "would encourage parties to parlay *Cohen*-type collateral orders into multi-issue interlocutory appeal tickets," *Swint v. Chambers County Comm'n,* —— U.S. ——, 115 S.Ct. 1203, 1211, 131 L.Ed.2d 60 (1995). As in *Swint,* the district court's discovery order is not "inextricably intertwined" with the court's denial of Iran's motion to dismiss. *Id.* at ——, 115 S.Ct. at 1212. The district court found that the case fell within § 1605(a)(2) without considering whether Iran had breached its discovery obligations. We have affirmed that interlocutory ruling. The sanction McKesson sought is therefore beside the point at this preliminary stage of the litigation. If the district court ultimately rules against McKesson on the jurisdictional issues, or if McKesson loses on the merits, it can raise the discovery issues in an appeal from the final judgment. We therefore hold that we do not have pendent appellate jurisdiction over the discovery order.

\*   \*   \*   \*   \*   \*

The judgment of the district court denying Iran's motion to dismiss is affirmed. McKesson's cross-appeal is dismissed for lack of appellate jurisdiction.

*So ordered.*

---

10. McKesson suggested that the court sanction Iran by finding that the "Government of Iran exercised the necessary degree of control over

the other defendants to create a principal/agent relationship with respect to the matters alleged in the Amended Complaint."