TRANSAMERICA LEASING
INC., et al., Plaintiffs,

v.

LA REPUBLICA DE VENEZUELA
and Fondo de Inversiones de
Venezuela, Defendants.

No. 97–cv–1354 (JLG).

United States District Court,
District of Columbia.

Sept. 30, 1998.

Cherie B. Artz, Schnader Harrison Segal & Lewis LLP, Washington, DC, John E. Bradley, Andrew S. Epstein, Lisa M. Cobb, Benjamin P. Deutsch, Schnader Harrison Segal & Lewis LLP, New York, NY, Arlin M. Adams, Diana S. Donaldson, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, Counsel for Plaintiffs.

Alexander E. Bennett, Mark H. Stumpf, Steven G. Reade, Brian J. Sonfield, Arnold & Porter, Washington, DC, Counsel for Defendants.

### MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on the Defendants', La Republica de Venezuela ("Venezuela") and Fondo de Inversiones de Venezuela's ("FIV"),[1] Motion to Dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Defendants seek dismissal for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1604,[2] *forum non conveniens*, failure to state a claim upon which relief can be granted, and of Plaintiffs' demand for punitive damages.

In addition, the Defendants have filed a Motion for Oral Hearing on and a Motion to Strike Declarations Submitted in Opposition to Defendants' Motion to Dismiss. The Plaintiffs filed a separate Motion for Oral Hearing on and Motion for Jurisdictional Discovery.

For the reasons that follow, the Court concludes that it has subject matter jurisdiction which it should not decline under the doctrine of *forum non conveniens* and that the Plaintiffs' claims and demand for punitive damages are valid. As explained more fully below, the Defendants' Motion to Dismiss the Complaint is denied.

1. Defendant FIV is an instrumentality of Defendant Venezuela that assists in financial and other restructuring of government-owned corporations. (Mem. Supp. Defs'. Mot. Dismiss at 5.)

2. Subject to existing international agreements to which the United States is a party at the time of enactment of this Act, a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.
28 U.S.C. § 1604 (1994). One exception is
(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
. . .
(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a com-

### I. BACKGROUND

Between March 17, 1980 and June 1, 1993, the Plaintiffs, domestic and foreign corporations, leased shipping equipment such as containers, chassis, and trailers ("intermodal equipment") to Compañia Anonima Venezolana de Navegación ("CAVN"), a Venezuelan government-owned steamship line subsidized and protected from 1917 to 1991. (Compl., ¶¶ 35–36; Barroeta Decl. I ¶ 4.; Bradley Decl. I ¶ 22.)

In September 1991, Defendant FIV commissioned Booz Allen & Hamilton, Inc. ("BAH"), to conduct a review and analysis of CAVN. (Mem. Supp. Defs'. Mot. Dismiss at 5; Bradley Decl. I ¶ 25.)

In October 1991, BAH reported to Defendant FIV that if the Defendants did not restructure CAVN it would lose over $140 million in the ensuing five years. (Bradley Decl. I Ex. K at 3, 11, Ex. R at 9.) BAH concluded that the FIV and the Ministry of Transport and Communications ("MTC"), an agent of Defendant Venezuela, "as principal owners of [CAVN], must now decide on the future of CAVN." (Bradley Decl. I Ex. K at 18.) BAH recommended that the Defendants restructure CAVN, by significantly changing its operations. (Bradley Decl. I Ex. K at 20.)

On July 27, 1992, Defendant Venezuela, by its agent the Sectoral Cabinet for Economic and Social Policy Issues, ordered and adopted measures to reorganize CAVN.[3]

mercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. 28 U.S.C. § 1605(a)(2).

3. The Cabinet named specific public and private institutions to be responsible for particular restructuring measures and set deadlines for their accomplishment. *Id.* Specifically, it decreed that BAH would conduct a further reorganization study. (Bradley Decl. I Ex. O at 3.) It ordered CAVN's Board of Directors to sell vessels and various groups to operate a trust between FIV and CAVN, to handle CAVN's short term debt, capitalize its external debt, and make strategic association plans with other carriers. *Id.* at 3–5. Lastly, the Cabinet mandated that the FIV have a company audit, in particular CAVN's intermodal equipment management. *Id.*

(Bradley Decl. I Ex. O at 3–5, Ex. R at 8; Barroeta Decl. I ¶ 13.) Between October 1991 and March 1993, CAVN put forward a restructuring proposal subject to approval and later approved by the Economic Cabinet. (Bradley Decl. I Ex. R at 8.) On March 31, 1993, "subject to the conditions laid down by [Defendant] FIV, Booz–Allen developed [an updated] restructuring option and company plan . . ." that it delivered in a second report based on a "new political and economic scenario suggested by FIV." (Bradley Decl. I Ex. R at 10–11.)

Beginning in 1992, CAVN, as a result of losses, allegedly failed to pay rental, repair, and other lease charges exceeding $55 million to the Plaintiffs pursuant to the terms of the equipment lease agreements. (Compl. ¶¶ 37–38.) In 1993 and 1994, Defendant Venezuela directed CAVN to enter into repayment and restructuring agreements with the Plaintiffs. (Barroeta Decl. I Ex. A; Bradley Decl., ¶¶ 45–56.) CAVN also failed to pay its obligations under the more recent repayment and restructuring agreements, that sum exceeded an additional $55 million. (Compl. ¶¶ 74–78; Bradley Dec. I ¶¶ 45–56.) In October 1994, CAVN declared a suspension of payments and commenced bankruptcy proceedings in Caracas, Venezuela. (Compl. ¶ 62.) CAVN failed to return to Plaintiffs some of the equipment leased, valued at approximately $9 million. (Compl. ¶ 38.)

Claiming that CAVN is an agent of the Defendants, the Plaintiffs brought this action for breach of the equipment lease agreements, conversion, breach of restructuring and repayment plans, and tortious interference with contract. (Compl. ¶¶ 17–21.) The Defendants filed this motion to dismiss claiming that CAVN is not their agent and that Venezuela, as a foreign state, and the FIV, as an agent or instrumentality of a foreign state, are otherwise immune from jurisdiction under 28 U.S.C. § 1604. (Mem. Supp. Defs'. Mot. Dismiss at 1, 2.)

On Sept. 8, 1992, the Technical Secretary of the Operational Committee wrote on official letterhead to the Corporate Services General Manager of CAVN about the Defendants restructuring plan. (Barroeta Decl. I Ex. A.) The Secretary

## II. ANALYSIS

### A. Subject Matter Jurisdiction

█ A foreign government is liable for the actions of its instrumentality if the instrumentality is so extensively controlled by the government that a relationship of principal to agent is created. *See First Nat'l, City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 629, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)("*Bancec*"); *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 446–47 (D.C.Cir.1990). In deciding whether there is subject matter jurisdiction, the plaintiff has the "burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship." *Foremost–McKesson,* 905 F.2d at 447.

Specifically, the Court explained that:

to address a motion to dismiss under Rule 12(b)(1) where the suit involves a foreign sovereign and the court's jurisdiction over the sovereign is contested, the district court must do more than just look to the pleadings to ascertain whether to grant the motion to dismiss. The district court has "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction."

905 F.2d at 449 (quoting *Prakash v. American University,* 727 F.2d 1174, 1179 (D.C.Cir.1984)).

█ In *McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346 (D.C.Cir.1995), the D.C. Circuit affirmed the District Court's finding of an agency relationship where it relied on such factors as (1) majority shareholding and majority control of a board of directors, (2) extensive government involvement (via the board of directors or otherwise) in the day-to-day operations of the instrumentality, and (3) manifestations by the government that the instrumentality could act for it (either made to the instrumentality, *i.e.* actual authority, or to a third party, *i.e.* apparent authority). *Id.* at 352; *see McKesson Corp. v. Islamic Republic of*

stated that "the Cabinet agreed . . . to require CAVN to proceed with the immediate implementation of initiatives aimed at improving its administrative management." (Barroeta Decl. I Ex. A.)

*Iran,* No. 82–0220 (D.D.C. Aug. 23, 1993), at 47–48.

All of the factors relied upon by the trial court in *McKesson* are present in the case at bar and are set out below.[4]

### 1. Stock Ownership

There is no dispute that the Defendants, through agencies and instrumentalities of Venezuela, owned all of the shares of CAVN. (Compl. ¶ 18, Barroeta Decl. I ¶ 4, Ex. Z.) The shareholders were the FIV as the majority shareholder; the Ministries of Transportation and Communications, Treasury, and Defense; and Dianca and Transportada Maritima Venezolana, both state owned corporations. *Id.*

### 2. Board of Directors

The Defendants appointed all of the members of the Board of Directors of CAVN. The Chairman of the Board was the President of CAVN. (Planas Decl. ¶ 10.) Moreover, the President of Venezuela appointed high ranking officers of the Venezuelan Navy to serve as President of CAVN during their service in the Navy including a Rear Admiral and a Vice–Admiral. (Bradley Decl. I ¶ 9.)

The Defendants, as shareholders, also elected the other Board members. (Bradley Decl. ¶ 7.) On August 6, 1987, in a letter to the Federal Maritime Commission (FMC), the counsel for CAVN acknowledged that Venezuela had the right to appoint or disapprove the appointment of a majority of the directors or the chief operating or executive officer of CAVN. (Bradley Decl. Ex. A,B.) Also, in an undated memorandum regarding a meeting with the FMC, CAVN stated that Defendant Venezuela designated the members of the Board. (Bradley Decl. at Ex. B).

### 3. Day–to–Day Operations

In *McKesson,* the District Court found a foreign government, through a board of directors, was extensively involved in the day-to-day operations of an instrumentality because the board approved and confirmed important matters. *McKesson Corp. v. Islamic Republic of Iran,* No. 82–0220 (D.D.C. Aug. 23, 1993), at 47.

During the restructuring period in 1992 and years subsequent, the Defendants were even more extensively involved in the day-to-day operations of CAVN. As part of the restructuring plan, and in accordance with the BAH reports, the Defendants, through the Board of Directors and otherwise, directed CAVN to restructure its capital and improve its operations, especially with regard to the leasing and use of intermodal equipment. (Bradley Decl. I Ex. M, Ex. R at 11, 17–32.)

BAH identified CAVN's intermodal operations as the first priority for restructuring.[5] (Bradley Decl. I Ex. R at 17–32, 41–43.) Specifically, BAH recommended to the FIV that it arrange to "reposition all surplus equipment," "introduce vigorous managerial and cost control relating to administration of equipment," and shut down substantial portions of CAVN's service globally. (Bradley Decl. I Ex. R at 35.)

Defendant Venezuela considered and adopted BAH's recommendations regarding CAVN's intermodal problems. (Bradley Decl. I Ex. R at 7, 9, 10, Ex. S at 2, 3, 5.) On April 19, 1993, in response to the recommendation of the BAH restructuring study mandated by Defendant Venezuela and commissioned by the FIV, CAVN's Board of Directors appointed Captain Antonio Romero

---

4. The relevant jurisdictional facts are those existing at the time of the acts upon which the complaint is based. *See General Elec. Capital Corp. v. Grossman,* 991 F.2d 1376, 1381 (8th Cir.1993). Therefore, the Court will consider those facts existing in 1992 and thereafter, when CAVN allegedly failed to make payments under the equipment lease agreements.

5. CAVN was unprofitable because its intermodal equipment costs were high from accumulating a large inventory of idle rented shipping containers. (Bradley Decl. I Ex. M at 3, Ex. R at 17–18,

Tarazon Decl. ¶ 4.) An inventory of intermodal equipment is accumulated if foreign trade is not well-balanced (import/export) and empty equipment is not transferred for redelivery. (Bradley Decl. I Ex. M at 3.) For example, CAVN accumulated some inventory because it imported full containers from Japan but did not export freight to Japan. (Bradley Decl. I Ex. R at 23.) By May 1993, CAVN held idle 22,143 units of leased intermodal equipment in its inventory. (Bradley Decl. I Ex. S at 5.)

Sierraalta, a maritime professional and officer in the Venezuelan Navy, with full power and authority, to head a new Intermodal Division. (Bradley Decl. I Ex. S at 3.) The Board instructed Capt. Sierraalta to solve CAVN's intermodal problems and specifically to reduce inventory, redeliver surplus equipment, and implement a control system. (Bradley Decl. I Ex. M at 5–6, S at 3.)

Then on June 18, 1993, the Defendants commissioned BAH to implement a future systematic relocation policy for intermodal equipment. (Bradley Decl. I Ex. S at 8.) Capt. Sierraalta, who carried out the BAH models, reported that "the [B]oard of [Directors] was aware of [the] details ..." of these efforts, particularly of relocation of equipment. (Bradley Decl. I ¶ 25, S at 20, 25.)

On March 2, 1994, Capt. Sierraalta reported that during his tenure, "intensive information and support work [was] done in the intrermodal area...." (Bradley Decl. I Ex. S at 15.) He changed the procedure of handling invoices, held talks with and had training given to "intermodal finance, accounts and port-agent staff regarding the changes and improvements introduced" and had "specific instructions ... drawn up and sent to representative offices...." (Bradley Decl. I Ex. S at 14, 16.) He also changed the "chartering negotiations and port operations for the transfer of equipment to be relocated or dropped off," and he again recommended that "CAVN maintain the existing hierarchy in the principal intermodal office." (Bradley Decl. I Ex. S at 28.)

It appears to the Court that the Defendants, through the appointment of Capt. Sierraalta, effectively commandeered the principal intermodal operations of CAVN. (Bradley Decl. I Ex. S.) Capt. Sierraalta not only changed the day-to-day operating procedures of handling and monitoring intermodal equipment, (Bradley Decl. I Ex. S at 10–17, 27.), but he also made changes in administration and control, including changes in inventory control, inspections, and repairs to equipment. (Bradley Decl. I Ex. M at 2–6.)

Even outside of intermodal operations, the Defendants were involved in CAVN's opera-

tions. After November 1991 the Economic Department for the Sector, an agent of Defendant Venezuela, authorized the sale of some of CAVN's vessels. (Bradley Decl. I Ex. R at 8.)

### 4. Actual and Apparent Authority

In 1992 and years subsequent, the Defendants additionally manifested that CAVN could act for it. The Naval Vice–Admiral/CAVN President/ CAVN Chairman of the Board Efraim Diaz Tarazón often spoke with apparent authority in uniform on behalf of Venezuela. (Bradley Decl. I ¶ 10). On August 27, 1993, Vice–Admiral Tarazón, in full naval dress, assured representatives of Plaintiff Matson Leasing Company that Venezuela would support CAVN. (Bradley Decl. I ¶ 10; Bradley Decl. II ¶ 12.) In November 1993, CAVN's President Tarazón explained to the presidents of the leasing companies that "he had obtained a national government decision to inject funds into CAVN." (Bradley Decl. I Ex. S at 19.)

### 5. Financial Involvement

The Defendants were extensively involved in CAVN's financial management. In the August 6, 1987 letter to the FMC, CAVN's counsel acknowledged that the operating assets of CAVN were owned and controlled by Defendant Venezuela. (Bradley Decl. I Ex. A.) In 1992, Defendant Venezuela decided to "inject" funds into CAVN as part of the restructuring plan. (Bradley Decl. I Ex. S at 19.) On October 13, 1992, Defendant FIV and CAVN entered into a Trust Agreement at the order of and agent of Defendant Venezuela, the Operational Committee of the Sectoral Cabinet for Economic and Social Policy Issues. (Barroeta Decl. I ¶ 13–14.) The purpose of the Trust Agreement was for the FIV to take CAVN's assets as security for FIV's advance of funds to CAVN to satisfy its debts and attain liquidity. (Marlando Decl. ¶ 9.) Capt. Sierralta reported regarding the financial restructuring that, "[g]iven that the situation was so critical, the President [of CAVN's] office completed steps taken at the highest level [of the FIV and Venezuelan government]." (Bradley Decl. I Ex. S at 19.) An internal CAVN memorandum states that

Dr. Abadón Vivas Terán, once the President of FIV and then a member of its Executive Board, decided financially to restructure CAVN. (Bradley Decl. I Ex. EE at 1.)

On Nov. 5, 1993, in a facsimile transmission on FIV letterhead to Emily C. Weisensee of Plaintiff/Lessor Matson, Dr. Julian Villalba Villalba, the President of FIV stated that "this institution [the FIV] is currently implementing a process of restructuring of said shipping company [CAVN], involving the establishment of all the management procedures necessary vis-à-vis the National Executive and other official bodies, which will enable it to regularize its financial situation without delay and honor its external debt and other obligations." (Bradley Decl. I Ex. R.)[6] Prior to Bankruptcy in October 1994, CAVN recognized in an internal document that "permanent intervention by FIV ..." was necessary for future operations. (Bradley Decl. I Ex. FF ¶ 3.)

Factoring together the Defendants' ownership of all shares of CAVN stock, their appointment of all of the members of CAVN's board of directors, and their extensive involvement in CAVN's day-to-day activities, the Court finds that CAVN was an agent of the Defendants for purposes of determining jurisdiction. Accordingly, the Court concludes that it has jurisdiction.

### B. *Forum Non Conveniens*

In considering a motion to dismiss on grounds of *forum non conveniens,* the Court weighs both private and public interests. *Pain v. United Technologies Corp.,* 637 F.2d 775 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).[7]

■ With regard to private interest the Court considers:

[T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;

possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions of the enforcibility [sic] of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial.

*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). In weighing these factors, the Court gives considerable presumptive weight to the Plaintiffs' initial forum choice, particularly if the Plaintiffs are United States domiciliaries, as are nine of the twelve in this action. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.,* 339 U.S. 684, 697, 70 S.Ct. 861, 94 L.Ed. 1206 (1950); *Pain,* 637 F.2d at 784, (Mem. Opp'n. Defs'. Mot. Dismiss at 28–29).

■ Applying these factors the Court finds that there is easier access to sources of proof of both liability and damages from the District of Columbia than from Venezuela. Relevant documents constituting approximately 50 boxes and computer tapes from CAVN's United States headquarters in Miami, Florida, and its office in Houston, Texas, are located and accessible at Plaintiffs' counsel's offices in New York City. (Mem. Opp'n. Defs'. Mot. Dismiss at 28–29.) Although information on the breach of the equipment lease agreements may be as likely accessible in the United States as Venezuela, information with respect to the remaining three claims, and in particular on the restructuring, repayment agreements and damages, are likely more accessible from the domestic Plaintiffs than from the foreign Defendants insofar as the agreements were negotiated and executed in the United States and the alleged injuries are upon predominantly United States Plaintiffs. *See also Pain,* 637 F.2d at 788. Defendants' contention that some documents may need to be translated from Spanish to English, is insignificant in the broader context, because, as in a Vene-

---

6. On Nov. 5, 1993, in a facsimile transmission on FIV letterhead to Mr. Paul J. Capadaurro of Plaintiff/Lessor Transamerica, FIV President Villalba stated the same. (Bradley Decl. I Ex. R.)

7. Only if the Court determines that these interests weigh in favor of granting the motion, unlike

in the case at hand, then does the Court determine if the foreign forum is adequate or convenient. *See Friends For All Children, Inc. v. Lockheed Aircraft Corp.,* 717 F.2d 602, 607 (D.C.Cir. 1983).

zuelan Court, any English documents would need to be translated to Spanish. Spanish is not an obscure or abstruse language from which to translate. *See also Phoenix Canada Oil Co. v. Texaco,* 78 F.R.D. 445, 454 (D.Del.1978).

Second, potential witnesses are likely more available to attend a trial in the District of Columbia than in Venezuela. Again, although some potential witnesses are Spanish-speaking many are also English-speaking. As damages issues will likely dominate, potential witnesses are likely to be those with information on the lease, restructuring, repayment agreements, and damages in particular.[8] Although potential witnesses with information on the lease agreements may be as available to attend trial in the United States as in Venezuela, other witnesses with knowledge of the restructuring and repayment agreements, negotiated and executed in the United States, are likely more available to attend trial in the District of Columbia than in Venezuela.

Therefore, the Court finds that despite some relative advantages of Venezuela as a forum, the balance of private interests is in favor of a trial in the District of Columbia. If the balance of private interests are in favor of a trial in the District of Columbia, rather than in a foreign forum, then the Court need not address the second part. *Friends,* 717 F.2d at 608.

■ Nevertheless, the Court evaluates the public interest factors to show that its application also favor a trial in the District of Columbia. *See Friends,* 717 F.2d at 609. Public interest factors include the burden on the community, the local public interest in the dispute, and whether "foreign law will predominate if jurisdiction is retained." *Pain,* 637 F.2d at 792.

■ For the burden on the community, there would be no jury trial in this case and thus no jury burden. *See Bailey v. Grand Trunk Lines New England,* 805 F.2d 1097

(2d Cir.1986), *cert. denied,* 484 U.S. 826, 108 S.Ct. 94, 98 L.Ed.2d 54 (1987). For local public interest, the District of Columbia does, in fact, have an interest in an action against a foreign state. *See* H.R.Rep. No. 1487, 94th Cong., 2nd Sess. (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6631 (reasoning that, in enacting 28 U.S.C. §§ 1604–05, foreign states have diplomatic representatives in the District of Columbia and may defend easiest there).

For whether foreign law will predominate, this Court does not consider the burden of applying foreign law to be very significant in relation to the test overall. *See In re Disaster at Riyadh Airport,* 540 F.Supp. 1141, 1154 (D.D.C.1982). In cases brought under 28 U.S.C. §§ 1604–05, the Court applies the District of Columbia's choice of law rules. *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1463 (D.C.Cir.1995). For Venezuelan law to apply, the Defendants must demonstrate that either contractual obligations so require or initially that some conflict of law exists. *See Eli Lilly & Co. v. Home Ins. Co.,* 764 F.2d 876, 882 (D.C.Cir. 1985). The Defendants fail to do either. Even assuming that some conflict of law exists, the Defendants fail to demonstrate that Venezuelan law would apply.

In fact, at first glance it is not likely that Venezuelan law will apply. The test is which jurisdiction has "the most significant relationship to the dispute." *District of Columbia v. Coleman,* 667 A.2d 811, 816 (D.C.1995). Both of the tort claims (conversion and tortious interference with contract) can be said to have occurred at the place of injury, in this case where the Plaintiffs are located in the United States.[9] Moreover, the breach of restructuring and repayment agreements' claim involves contracts negotiated and executed in the United States, and the breach of equipment lease agreement claim involves leased property belonging predominantly to the United States Plaintiffs. Accordingly,

---

8. The Defendants have already admitted for purposes of this motion that CAVN breached equipment lease agreements, converted the equipment, and breached the restructuring and repayment plans. (Mem. Supp. Defs. Mot. Dismiss at 3, fn. 1.)

9. Generally, for torts the jurisdiction in which the injury occurred has the most significant relationship. Restatement (Second) of Conflict of Laws § 156 comment b (1969).

the United States appears to have the most significant relationship to the dispute and thus Venezuelan law likely will not predominate.

Therefore, as both public and private interests favor a trial in the District of Columbia, the Court does not decline subject matter jurisdiction under the doctrine of *forum non conveniens.*

### C. *Failure to State a Claim*

■ The Defendants claim that because they were not a party to any of the agreements, they cannot be held liable for breach. (Mem. Supp. Defs'. Mot. Dismiss at 37–40.) Only if the Plaintiffs can prove no set of facts in support of this claim can the Court dismiss. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As already discussed, for purposes of Defendants' motion, the Court has determined that CAVN acted as an agent such that the Defendants can be held liable for its breach. *See McKesson*, 52 F.3d at 352.

■ The Defendants also argue that the Plaintiffs' claim for conversion should be dismissed because it is a contract claim in the guise of a tort and because the stipulated damage remedy clause in the equipment lease agreements preclude the Plaintiffs from claiming conversion. (Mem. Supp. Defs'. Mot. Dismiss at 40–42.) However, in the marine equipment lease agreement context, even with such a clause, a claim for conversion may be brought simultaneously with a claim for breach of contract. *Transamerica Leasing Inc. v. Amazonica, S.A.*, 1997 WL 834554, 1998 A.M.C. 254, 255 (S.D.Al.1997) (claim for conversion based on the defendant's failure to return the plaintiffs' containers); *Flexi–Van Leasing, Inc. v. Pharos Lines, S.A.*, 808 F.Supp. 237, 254 (S.D.N.Y. 1992) (conversion claim based on failure to return); *Thyssen, Inc. v. S.S. Rio Capaya*, 1988 A.M.C. 1878 (M.D.Fla. Feb.17, 1988) (conversion claim based on failure to return).

The Defendants next argue that the Plaintiffs fail to state a claim of tortious interference with the contract. This is incorrect. In *Genetic Systems Corp. v. Abbott Laboratories*, 691 F.Supp. 407 (D.D.C.1988), the Court held that a claim for tortious interference is established when a plaintiff pleads "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Id.* at 422. The Plaintiffs claim, in this regard, avers each element required in the District of Columbia and the Defendants have not demonstrated that the Plaintiffs can prove no set of facts in support of it. (Compl. ¶¶ 79–83.)

### D. *Punitive Damages*

■ The Defendants claim that the Plaintiffs have not alleged "the type of outrageous misconduct or malice necessary to justify punitive damages." (Mem. Supp. Defs'. Mot. Dismiss at 44.) In *Rogers v. Loews L'Enfant Plaza Hotel*, 526 F.Supp. 523 (D.D.C.1981), the Court held that punitive damages can be recovered for "willful tort actions which are founded on the defendant's 'outrageous conduct such as maliciousness, wantonness, gross fraud, recklessness and willful disregard of another's rights.' " *Id.* at 534 (quoting *Riggs Nat'l, Bank v. Price*, 359 A.2d 25, 28 (D.C.1976)). The Plaintiffs' allegations that the Defendants intentionally misled the Plaintiffs as to the financial situation of CAVN in order to delay payments or any action by Plaintiffs could constitute the type of outrageous conduct that warrants the award of punitive damages. (Compl., ¶¶ 52–56.). Thus, the Plaintiffs have stated a claim for punitive damages and the Defendants have not demonstrated that the Plaintiffs can prove no set of facts in support of it. *See Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### E. *Motion to Strike Declarations*

■ In a separate motion, the Defendants seek to strike Plaintiffs' declarations and exhibits. As is evident from the above discussion, the Court relies in many instances on these same materials for its findings and conclusions in this memorandum. Contrary to Defendants' position, these declarations are not argumentative or conclusory,

but contain reasonably objective statements, official documents, and business records. They are not pleadings subject to a motion to strike pursuant to Fed.R.Civ.P. 12(f), but are items offered to assist the Court in deciding the existence of subject matter jurisdiction, something even the Defendants admit is not prohibited by the Federal Rules of Civil Procedure. (Def.'s Mot. Strike Decls. at 4.); *see Prakash*, 727 F.2d at 1179. As previously stated, the Court has wide latitude to consider matters outside the pleadings for jurisdictional purposes and does so here with regard to the declarations. *Foremost–McKesson*, 905 F.2d at 449.

### III. *CONCLUSION*

For the reasons set forth above, the Defendants, La Republica de Venezuela (Venezuela) and Fondo de Inversiones de Venezuela's (FIV), Motion to Dismiss the Complaint, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) is denied. An appropriate Order accompanies this Memorandum.

### ORDER

Upon consideration of Defendants' Motion to Dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6), the opposition, replies thereto, Declarations, and Exhibits, and for the reasons stated in the accompanying memorandum of law, it is by the Court this 29th day of September 1998,

**ORDERED** that Defendants' Motion to Dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6) is **DENIED**; it is further

**ORDERED** that Defendants' Motion for Oral Hearing on Defendants' Motion to Dismiss the Complaint is **DENIED**; it is further

**ORDERED** that Defendants' Motion for Oral Hearing on Defendants' Motion to Strike Declarations Submitted in Opposition to Defendants' Motion to Dismiss is **DENIED**; it is further

**ORDERED** that Defendants' Motion to Strike Declarations Submitted in Opposition to Defendants' Motion to Dismiss is **DENIED**; it is further

**ORDERED** that Plaintiffs' Motion for Oral Hearing on Plaintiffs' Motion for Jurisdictional Discovery is **DENIED**; it is further

**ORDERED** that Plaintiffs' Motion for Jurisdictional Discovery is **DENIED**; it is further

**ORDERED** that the parties shall appear for a status/scheduling hearing on **October 28, 1998 at 11:00 a.m. in Courtroom 7**; it is further

**ORDERED** that the parties shall submit a joint report pursuant to Local Rule 206 of this Court by October 21, 1998.