McKESSON HBOC, INC., et al.,
Appellees/Cross–Appellants,

v.

ISLAMIC REPUBLIC OF IRAN,
Appellant/Cross–Appellee.

Nos. 00–7157 and 00–7263.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 1, 2001.

Decided Nov. 16, 2001.

Thomas G. Corcoran, Jr. argued the cause for appellant/cross-appellee. With him on the briefs was Mary-Ellen Noone.

Mark N. Bravin argued the cause for appellees/cross–appellants. With him on the briefs were Ralph N. Albright, Jr., Peter Buscemi and Mark R. Joelson.

Before EDWARDS, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

McKesson HBOC, Inc., an American corporation, owns a minority interest in an Iranian dairy. Following Iran's 1979 Islamic Revolution, the dairy cut off the flow of capital and other material to McKesson, froze out McKesson's board members, and stopped paying McKesson's dividends. After years of litigation, including two appeals to this court, the district court granted summary judgment for McKesson, holding the Islamic Republic of Iran liable for expropriating McKesson's equity in the dairy. Following a bench trial on the value of McKesson's holdings, the district court ordered Iran to pay over $20 million in compensation for, among other things, expropriated equity and withheld dividends. In this appeal, Iran argues that federal courts lack jurisdiction over it, that material issues exist as to its liability for expropriation, and that the district court erred in valuing McKesson's assets. McKesson cross-appeals, challenging the district court's assessment of simple rather than compound interest. We affirm in most respects. Jurisdiction exists pursuant to the Foreign Sovereign Immunities Act's exception for commercial acts of a foreign sovereign that cause direct effects in the United States. The district court's careful consideration of the valuation evidence easily survives clear-error review. And although the district court may have erred in finding that international law precludes awards of compound interest, it acted well within its broad discretion to grant

simple interest. But because we find that genuine issues of material fact exist as to whether Iranian corporate law excused the dairy's withholding of dividends, we reverse the district court's grant of summary judgment on the issue of Iran's liability for expropriating McKesson's equity and remand that portion of the case for trial.

### I.

For many years prior to Iran's 1979 Islamic Revolution, McKesson HBOC, Inc., appellee and cross-appellant, contributed capital and personnel to Sherkat Sahami Labaniat Pasteurize Pak, an Iranian dairy ("Pak Dairy"). McKesson's representatives made up a majority of Pak Dairy's board of directors.

Following the Revolution, McKesson's ties with Pak Dairy began to weaken. It no longer received its standard yearly dividends, and soon lost control of the dairy's board, withdrawing its last two directors in October, 1981. Since then, McKesson has neither participated in Pak Dairy's business nor received shareholder communications or compensation for its investment, even though it still owns a thirty-one percent interest in the dairy.

In 1982, McKesson, along with its insurer, the Overseas Private Investment Corporation (OPIC), filed suit in the United States District Court for the District of Columbia alleging that the Islamic Republic of Iran, appellant and cross-appellee, illegally expropriated McKesson's interest in Pak Dairy. Pursuant to Executive Order No. 12,294, 46 Fed. Reg. 14,111 (Feb. 24, 1981), McKesson's claim was transferred to the newly created Iran–United States Claims Tribunal which, by virtue of the Algiers Accords (which settled the Iran hostage crisis), had exclusive jurisdiction over suits involving American claims to frozen Iranian assets. *See generally* Declaration of the Government of the Democratic and Popular Republic of Algeria, Jan. 19, 1981, Iran–U.S., 20 I.L.M. 224. Although the Claims Tribunal decided that Iran's interference with McKesson's rights had not amounted to an expropriation by January 19, 1981, the Tribunal's jurisdictional cut-off date, it did find that Pak Dairy had illegally withheld McKesson's 1979 and 1980 dividends. *Foremost Tehran, Inc. v. Iran*, 10 Iran–U.S. Cl. Trib. Rep. 228, 250 (1986). The Tribunal awarded McKesson in excess of $900,000 as compensation for withheld dividends, plus approximately $500,000 for related breach-of-contract claims. *Id.* at 252–53, 254–55, 257–58.

Renewing its claim in district court, McKesson argued that Iran had expropriated its equity in Pak Dairy after the Tribunal's jurisdictional cut-off date. Iran moved to dismiss, arguing primarily that the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1602–1611, rendered it immune from suit in federal court. The district court denied this motion, and we affirmed in part and remanded in part. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449–51 (D.C.Cir.1990) ("*McKesson I*"). In doing so, we held that McKesson had provided adequate evidence of federal jurisdiction pursuant to the FSIA exception for suits based on "commercial activity … that … causes a direct effect in the United States." 28 U.S.C. § 1605(a)(1); *see McKesson I*, 905 F.2d at 449–50. Subsequently, Iran again challenged federal jurisdiction, arguing among other things that an intervening Supreme Court decision, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), undermined *McKesson I*. *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 349 (D.C.Cir.1995) ("*McKesson II*"). Distinguishing *Weltover* and deferring to *McKesson I*, we affirmed the district court's denial of Iran's renewed motion to dismiss. *Id.* at 350–51.

With the jurisdictional issue seemingly—though as we shall soon see, not finally—resolved, both parties moved for summary judgment on liability. Granting summary judgment for McKesson, *McKesson Corp. v. Islamic Republic of Iran*, No. 82–220, mem. op. at 31, 1997 WL 361177 (D.D.C. June 23, 1997), the district court scheduled a bench trial to determine damages. Just before trial, Iran once again moved to dismiss for lack of jurisdiction, arguing that the International Guaranty Agreement (IGA), which governs the resolution of claims against Iran to which the United States government and its instrumentalities are subrogated, requires arbitration rather than litigation. The district court denied the motion, heard several weeks of testimony on valuation, and then issued findings valuing McKesson's assets—including equity in Pak Dairy, dividends, and simple interest—at just over $20 million. *McKesson Corp. v. Islamic Republic of Iran*, mem. op. at 53, 116 F.Supp.2d 13, —— (D.D.C.2000). The district court denied McKesson's subsequent motion for reconsideration of the court's assessment of simple rather than compound interest. *McKesson Corp. v. Islamic Republic of Iran*, No.82–220, mem. op. at 13 (D.D.C. Sept. 28, 2000).

Iran now appeals the grant of summary judgment on liability as well as the district court's valuation of McKesson's holdings in Pak Dairy. Iran also appeals the district court's rejection of its FSIA and IGA jurisdictional arguments. McKesson cross-appeals the denial of its motion for reconsideration of the decision to award only simple interest.

## II.

■ We begin with Iran's jurisdictional arguments. A foreign nation's entitlement to sovereign immunity raises questions of law reviewable de novo. *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1169 (D.C.Cir.1994).

The FSIA immunizes foreign sovereigns, as well as their agents and instrumentalities, from federal court jurisdiction, *see* 28 U.S.C. §§ 1603(a), 1605, unless the case falls within one of several exceptions specified in the act, *see id.* § 1605; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country...."). McKesson argues, and the district court held, that jurisdiction over Iran exists pursuant to the FSIA's exception for "any case ... in which the action is based upon a commercial activity ... of the foreign state ... that ... causes a direct effect in the United States." 28 U.S.C. § 1605(a)–(b).

■ This court has twice considered whether the commercial activity exception applies to McKesson's claim, holding both times that the alleged effects of Iran's expropriation—including the cut-off of the "constant flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging" between the two companies, *McKesson I*, 905 F.2d at 451, as well as the abrupt end of "McKesson's role as an active investor," *McKesson II*, 52 F.3d at 350—were sufficiently direct to create federal jurisdiction. It is true, as Iran stresses, that our two earlier decisions found McKesson's jurisdictional showing sufficient only to survive a motion to dismiss, *id.* at 351, whereas this time we review a district court order granting summary judgment. Though we do not here assume the validity of McKesson's factual assertions, *see United States v. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), this distinction makes no difference, for Iran does not dispute the particular facts on which our two earlier decisions relied. Indeed, the district court, reviewing the record without

obligation to assume the veracity of either party's assertions, cited the same facts that *McKesson I* and *McKesson II* found sufficient for "direct effects" jurisdiction. *See McKesson Corp. v. Islamic Republic of Iran*, No. 82–220, mem. op. at 10 n.10, 1997 WL 361177 (D.D.C. June 23, 1997). Because we are presented with jurisdictional facts identical to the ones relied on by our two earlier decisions, and because Iran does not challenge the veracity of those facts (it challenges only their sufficiency), the "law of the case" doctrine requires us to follow those two decisions. *McKesson II*, 52 F.3d at 350 ("[L]aw-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court.") (quoting *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C.Cir. 1995)) (internal quotation marks omitted). As we said in *McKesson I*, "the alleged effects of freezing-out American corporations in their ownership of Pak Dairy are at least as substantial and direct as effects alleged in prior cases in which this court and other circuits have found 'direct effects.'" *McKesson I*, 905 F.2d at 451.

 Iran argues that even if some elements of its expropriation had direct effects in the United States, federal courts may not exercise jurisdiction over one particular aspect of that claim: Pak Dairy's withholding of McKesson's dividends. In support of this proposition, Iran argues first that in *Kingdom of Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), the Supreme Court established an exclusionary principle under which no fact that could not have independently served as grounds for jurisdiction may serve as a basis for a foreign state's liability, and second, that the "direct effects" exception to claims based on commercial transactions does not apply where, as here, the place of payment lies outside the United States. In our view, the first argument has no merit, thus rendering the second irrelevant. *Nelson* held that commercial-activity jurisdiction cannot exist unless the commercial activity that forms the basis for jurisdiction also serves as the predicate for the plaintiff's substantive cause of action. *See* 507 U.S. at 357–58, 113 S.Ct. 1471. Here, McKesson's extensive showing of direct effects flowing from the commercial activity on which its cause of action rests establishes the nexus found lacking in *Nelson*. Regardless of whether denial of dividends alone would give rise to federal court jurisdiction under the FSIA's commercial-activity exception, because the net effect of Pak Dairy's cut-off of commercial ties included not just nonpayment, but also the cessation of "the flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging," *McKesson I*, 905 F.2d at 451, the district court rightly considered the dividends issue both in determining that Iran had expropriated McKesson's equity interest and in awarding damages for that expropriation.

 Iran's alternative jurisdictional argument rests on the International Guaranty Agreement's arbitration clause: "[A]ny claim against the Government of Iran to which the Government of the United States may be subrogated as a result of any payment under such guaranty shall be the subject of direct negotiation between the two Governments." Agreement on Guaranty of Private Investments, Sept. 17, 1957, U.S.–Iran, 8 U.S.T. 1599, 1600–01. According to Iran, this clause applies to OPIC's claims because OPIC insured McKesson's interest in Pak Dairy, thus precluding federal court jurisdiction. Acknowledging that OPIC is a government instrumentality within the meaning of the IGA, McKesson argues that Iran has waived its IGA argument. As McKesson points out, Iran has actively litigated this case for nine years, never once mentioning the arbitration clause nor attempting to

begin IGA arbitration proceedings. Iran responds that subject-matter jurisdiction cannot be waived.

■■ We need not determine whether Iran waived this defense, however, for in our view, although the IGA might well bar *OPIC* from proceeding, it has no effect on the district court's jurisdiction over *McKesson's* claims. Even though OPIC has compensated McKesson for part of its loss, McKesson still owns title to its equity in Pak Dairy and to its unpaid dividends, and it is well-settled that where an insured party holds title to confiscated property, the title holder is the appropriate party to bring a claim for compensation. *See Mobile & Montgomery Ry. Co. v. Jurey,* 111 U.S. 584, 593, 4 S.Ct. 566, 28 L.Ed. 527 (1884); *Foremost Tehran,* 10 Iran–U.S. Cl. Trib. Rep. at 239 ("[T]he governing law of the settlement agreements, that of the District of Columbia, ... like other common law systems, provides that an insured party who assigns a limited interest to its insurer is the proper party to bring a claim for compensation for the entire loss."); RESTATEMENT (SECOND) OF TRUSTS § 280 (1959). The settlement agreement between McKesson and OPIC states that McKesson will "maintain the legal title in and to all of the aforesaid items for the benefit of and in trust for OPIC." *Foremost Tehran,* 10 Iran–U.S. Cl. Trib. Rep. at 238–39 (quoting August, 1981 settlement agreement between OPIC and McKesson). Relying on this language, the Claims Tribunal held that McKesson "is legally entitled to pursue a claim for recovery of the insured portion of its losses as well as the uninsured portion.... [R]ecovery by [McKesson] of a measure of compensation from its insurers cannot affect its title to the claim against [Iran]." *Id.* at 239. The IGA thus presents no bar to federal court jurisdiction in this case.

### III.

This brings us to Iran's contention that the district court prematurely granted summary judgment on liability in McKesson's favor. A court may grant summary judgment only when it finds "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). To defeat a motion for summary judgment, the opposing party (for purposes of this issue, Iran) must demonstrate the existence of disputed issues by reference to affidavits or other materials that "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). The court must resolve any doubts and make all reasonable inferences in favor of the opposing party. *Abraham v. Graphic Arts Int'l Union,* 660 F.2d 811, 814–15 (D.C.Cir.1981). We review grants of summary judgment de novo. *Summers v. Dep't of Justice,* 140 F.3d 1077, 1078 (D.C.Cir.1998).

■ Iran first challenges the district court's conclusion that an agreement between Iran and the United States, the 1955 Treaty of Amity, gave McKesson a right to recover its expropriated property. Although treaties are the "supreme Law of the Land," U.S. CONST. art. VI, cl. 2, they provide no basis for private lawsuits unless implemented by appropriate legislation or intended to be self-executing, *see Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J., concurring), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). If a treaty contains language clearly indicating its status as self-executing, courts regard that language as conclusive. *See Cardenas v. Smith,* 733 F.2d 909, 918 (D.C.Cir.1984); *see also Tel–Oren,* 726 F.2d at 809 (Bork, J., concurring) (noting that treaties that "speak in terms of individual rights" may be regarded as self-executing). The Trea-

ty of Amity contains just such language: It explicitly creates property rights for foreign nationals, *see* Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955, U.S.–Iran, art. IV, cl. 2, 8 U.S.T. 899, 903 ("[P]roperty [of foreign nationals] shall not be taken except for a public purpose, nor shall it be taken without just compensation."), and contemplates judicial enforcement of those rights, *see id.* art. IV, cl. 1 ("Each High Contracting Party ... shall assure that [the] lawful contractual rights [of foreign nationals] are afforded effective means of enforcement....").

Iran does not dispute that the Treaty of Amity creates enforceable rights, but instead contends that its clause stating that "[p]roperty of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party ... ," Treaty of Amity art. VI, cl. 2, only "confers a right of action on an Iranian citizen in a U.S. court," Appellant's Opening Br. at 30. As the district court convincingly observed, however, although this language suggests that one party will receive protections within the territory of the other party, it doesn't say that those protections can only be enforced in the territory of the other party. *McKesson Corp. v. Islamic Republic of Iran,* No. 82–220, mem. op. at 27–26, 1997 WL 361177 (D.D.C. June 23, 1997). Such a limited interpretation, moreover, flatly conflicts with the treaty's purpose—protecting property of U.S. nationals—particularly because Iran's post-revolutionary courts cannot provide adequate remedies for U.S. claims. *See Rockwell Int'l Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 587–88 (2d Cir.1983) (noting that federal courts have "consistently rejected" the proposition that the post–revolutionary Iranian court system can afford adequate remedies to U.S. claimants).

Iran next argues that summary judgment was inappropriate because it raised genuine issues of material fact as to whether Pak Dairy's refusal to pay McKesson's dividends was justified by McKesson's failure to comply with Iranian corporate law—specifically, the requirement that shareholders must "come to the company" to collect their dividends. Though skeptical of this requirement, the district court granted summary judgment because, even if the requirement existed, McKesson's compliance with it would have been futile. This is a tricky issue, but reviewing the record ourselves, we think Iran has raised genuine issues of material fact sufficient to survive summary judgment on liability.

■ We begin with Iran's contention that its corporate law requires shareholders to "come to the company"—that is, to physically appear at a company's office—in order to collect dividends. McKesson argues that this requirement merely reflects non-binding custom and therefore that it could not excuse Pak Dairy's non-payment of dividends. This issue, like all determinations of foreign law, may be resolved at summary judgment. *See* FED.R.CIV.P. 44.1; 9 CHARLES WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2446, at 656–58 (2d ed. 1995).

Iran's numerous affidavits suggest that in Iran, "it is assumed that there is a legal requirement of physically appearing at the company with a receipt. In a proceeding in an Iranian court, the proponent of the argument that an Iranian company was required to pay dividends in any other way would be put to a very heavy burden of proof and every inference would be taken against him." Fakhari Aff. IV ¶ 9. Iran's affidavits also show that where a "come to the company" requirement prevails, a corporation may not be held liable for nonpayment unless and until it denies

a shareholder's valid, in-person request for dividends. *See* Fakhari Aff. I ¶ 13; Fakhari Aff. II ¶ 3. The affidavits, however, fall short of proving that this general practice reflects a legal requirement applicable to all Iranian corporations. Indeed, Iran's experts unanimously state that whatever the prevailing custom and practice, Iranian law, reflected in Article 57 of Iran's Commercial Code, permits corporate boards to select any method of disbursing dividends. *See* Dadyar Aff. I ¶ 7; Fakhari Aff. I ¶ 14.

■ Thus, while we agree with the district court that no general principle of Iranian corporate law excuses Pak Dairy's withholding of McKesson's dividends due to its failure to come to the company, the record contains testimony that Iranian law permitted Pak Dairy's board of directors to adopt such a binding requirement. To survive summary judgment, then, Iran need only make a credible showing that Pak Dairy exercised its discretion to implement a "come to the company" requirement. We think it has made such a showing. Pak Dairy's chief accountant states in his affidavit that "dividends are paid to shareholders by means of a cheque, and the shareholders must come to Pak Dairy to receive the cheque. The cheque is delivered to the shareholder against his receipt in the Company's documents, especially prepared for this purpose after his identity and ownership is established by the Company's officials." Dadyar Aff. I ¶ 7. The chief accountant further characterized this policy as "the mode of payment chosen by Pak Dairy ... [s]ince long ago, in particular in 1981 and 1982 and up to the present." Dadyar Aff. II ¶ 2.

Calling these affidavits "self-serving, vague, and uncorroborated," McKesson argues that they are insufficient to establish a genuine issue of material fact. Appellee's Opening Br. at 26. It is true that the chief accountant's affidavits refer to no documents supporting his assertions, and that we have held under some circumstances—for example, in *Doe v. Gates*, 981 F.2d 1316 (D.C.Cir.1993)—that a party relying on unsupported affidavits cannot survive summary judgment. The inadequate affidavit in *Gates*—submitted by the plaintiff in a discrimination case—had two critical defects not present here: The plaintiff-affiant had no direct knowledge of company policy, and the defendant had made an extensive showing that no discriminatory policy existed. *Id.* at 1322–23; *see also id.* at 1323 (granting summary judgment in part because plaintiff failed to "provide[ ] some direct evidence of someone having knowledge of th[e discriminatory] policy asserting it to exist"). Here, Pak Dairy's chief accountant provided firsthand testimony of his company's policy—specifically, that it had a "come to the company" requirement—and McKesson has submitted no evidence to the contrary. Under these circumstances, we think Iran's affidavits sufficient to preclude summary judgment, particularly in view of the generous reading we owe the opposing party's evidence at this stage.

McKesson argues that even if Pak Dairy had a "come to the company" requirement, summary judgment was still justified because compliance with such a requirement would have been futile. The district court agreed, relying on a 1980 telex to McKesson in which Pak Dairy announced that it would not pay "any sums of money for any reason to foreign share holders." Telex from Pak Dairy to Foremost–McKesson (May 27, 1980). Although the district court acknowledged (in a footnote) that Pak Dairy had sent a subsequent telex in November, 1981 expressing "its readiness for taking proper measures ... [a]s regards the payment of [McKesson's] dividend," Telex from Pak Dairy to Foremost–McKesson (Nov. 11, 1981), the court dismissed the latter communication as merely

an invitation to negotiate, which it regarded as "inconsequential" because "McKesson was under no legal obligation to settle for less than the amount to which it was entitled as a shareholder." *McKesson Corp. v. Islamic Republic of Iran*, No. 82–220, mem. op. at 22, 1997 WL 361177 (June 23, 1997). However plausible the district court's careful reading of the competing evidence, the role of the court at summary judgment is not to resolve the issue, but to determine whether the available evidence creates a genuine issue of fact for trial. *Abraham*, 660 F.2d at 814. Moreover, the district court plausibly inferred that in light of ongoing negotiations pursuant to the Algiers Accords, Pak Dairy's second telex represented a settlement overture, not an offer to give McKesson its dividends. However, because the opposite inference was no less plausible, the district court should have resolved the two competing, reasonable inferences in favor of Iran, the party opposing summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Implying nothing about the relative strength of the two telexes, we think the issue sufficiently close to require a trial on McKesson's futility claim, as well as Iran's "come to the company" defense.

### IV.

Next, Iran challenges the district court's valuation of McKesson's assets. Although, in view of our remand, we need not address this issue, we will consider it because it is fully briefed and because resolving it now will avert a second appeal should McKesson prevail. *See Jackson v. District of Columbia*, 254 F.3d 262, 271 (D.C.Cir. 2001) (commenting on the merits of an otherwise moot issue because of the possibility that it might "arise again in a new trial"); *Martini v. Fed. Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1348 (D.C.Cir.1999) (same).

A generous standard governs our review. The trial court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witness." Fed. R.Civ.P. 52(a). "If the district court's account of the evidence is plausible in light of the record, the court of appeals may not reverse it." *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

 The district court's careful consideration of the evidence and testimony on valuation easily survives this highly deferential standard. Not only do the district court's valuation findings fall well within the realm of plausibility, but in reaching them the court relied heavily on its own assessment of the credibility of the two competing expert witnesses. Such findings, the Supreme Court has warned, "can virtually never be clear error." *Id.* at 574, 105 S.Ct. at 1511.

 Only two of Iran's challenges require even brief consideration. First, Iran claims that the district court erred when calculating the amount of its award by converting rials to dollars at the official exchange rate prevailing at the time of the expropriation. According to Iran, the district court should have used a different, "open market" exchange rate. To the extent that this argument applies to the valuation of McKesson's equity, Iran is estopped from arguing that the district court committed reversible error because its own expert witness used the official exchange rate in converting rials to dollars in his equity valuation. *See Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533, 1539–40 (11th Cir.1993) ("[I]t is a 'cardinal rule' of appellate procedure 'that a party may not challenge as error a ruling or other trial proceeding invited by that party.' ") (citation omitted). To the extent

that the argument applies to the district court's valuation of McKesson's dividends, we think the district court's decision to use the official—rather than an "open market"—exchange rate rests on more than enough evidence to survive clear-error review. Particularly convincing to us, the district court relied on decisions of the Iran–U.S. Claims Tribunal, which invariably used the official exchange rate in converting rials to dollars. *McKesson Corp. v. Islamic Republic of Iran*, 116 F.Supp.2d 13, 39 (D.D.C.2000).

■ Second, Iran claims that the district court erred by awarding McKesson the value of its 1982 dividend without reducing its equity valuation by the same amount. Again, this argument is barred by estoppel: Iran's trial evidence—including the submissions of its own expert witness—failed to deduct the 1982 dividend from its proposed valuation. In any event, no double-counting occurred. Both experts valued McKesson's equity by projecting Pak Dairy's 1982 earnings into the future, *McKesson Corp. v. Islamic Republic of Iran*, 116 F.Supp.2d at 39 (D.D.C. 2000), while the 1982 dividend was based on Pak Dairy's 1981 earnings.

## V.

■ In its cross-appeal, McKesson challenges the district court's assessment of simple rather than compound interest. According to McKesson, the district court erred by holding that in light of its "finding that the clear majority of international courts have historically awarded only simple interest," *McKesson Corp. v. Islamic Republic of Iran*, No. 82–220, mem. op. at 2 (Sept. 28, 2000), customary international law *required* such an award. We review determinations of international law de novo. *See Echeverria–Hernandez v. INS*, 923 F.2d 688, 692 (9th Cir.1991) (applying de novo review to question of international law), *vacated on other grounds by* 946 F.2d 1481 (9th Cir.1991); *see also* FED.R.CIV.P. 44.1 ("[A]n issue concerning the law of a foreign country ... shall be treated as a question of law.").

■ McKesson argues that the district court had no discretion to award simple interest. For this proposition, McKesson relies on the Treaty of Amity, which states that property belonging to nationals and companies of the United States and Iran "shall not be taken ... without the prompt payment of just compensation," and that "[s]uch compensation shall ... represent the full equivalent of the property taken." Treaty of Amity, art. IV, cl. 2. In our view, however, the phrases "just compensation" and "full equivalent," on which McKesson relies, are far too ambiguous to require awards of compound interest.

■ Although we thus reject the proposition that the Treaty of Amity requires compound interest, we think McKesson makes a convincing case that contemporary international law does not, as the district court seems to have thought, require simple interest. The only source the district court relies on that unequivocally states that "compound interest is not allowable" under international law assessed the state of that law over fifty years ago. MARJORIE M. WHITEMAN, 3 DAMAGES IN INTERNATIONAL LAW 1997 (1943). And although the Iran–U.S. Claims Tribunal has never once awarded compound interest, other international tribunals have. *Compare McKesson Corp. v. Islamic Republic of Iran*, 116 F.Supp.2d at 41 ("[T]he Tribunal has never awarded compound interest."), *and, e.g., Anaconda–Iran, Inc. v. Iran*, 13 Iran–U.S. Cl. Trib. Rep. 199, 234–35 (1988) (refusing claimant's request for award of compound interest even though contract court was enforcing stipulated that such award was appropriate), *with,*

*e.g., Compania del Desarrollo de ·Santa Elena, S.A. v. Republic of Costa Rica,* 39 I.L.M. 1317, 1332–34 (Int'l·Ctr. for Settlement of Inv. Disputes 2000) (awarding compound interest), *and Kuwait v. Am. Indep. Oil Co. (Aminoil),* 21 I.L.M. 976, 1042 (1982) (same). Indeed, most contemporary sources, including the authority relied on most heavily by Iran, take the view that "although compound interest is not generally awarded under international law or by international tribunals, special circumstances may arise which justify some element of compounding as an aspect of full reparation." James Crawford, *Third Report on State Responsibility Submitted to the International Law Commission of the United Nations,* 2 Y.B.I.L.C. 50 (2000).

Accordingly, although customary international law may favor awards of simple interest, we think the district court erred in holding that it requires such awards. Had the district court relied solely on this holding, reversal might have been appropriate. In denying McKesson's motion for reconsideration, however, the district court held that "even if customary international law authorizes an award of compound interest at the discretion of the awarding body, this Court finds that the almost uniform practice of awarding only simple interest is a relevant and compelling consideration in the exercise of that discretion." *McKesson Corp. v. Islamic Republic of Iran,* No. 82–220, mem. op. at 12 (Sept. 28, 2000).

 Reviewing this element of the district court's rejection of McKesson's motion for reconsideration only for abuse of discretion, *see Anyanwutaku v. Moore,* 151 F.3d 1053, 1058 (D.C.Cir.1998), we find none. It is true, as McKesson points out, that some federal common-law principles require courts to "make the plaintiff whole." Appellee's Opening Br. at 65. Even if these principles support awards of

compound interest in tort cases, however, they fall well short of proving that the district court abused its discretion, particularly in light of the court's reliance on a far more relevant authority: the decisions of the Claims Tribunal, which invariably awards simple interest.

## VI.

We affirm the district court's holdings that federal courts have subject-matter jurisdiction over Iran under the FSIA's commercial-activity exception, that the IGA does not preclude federal jurisdiction over McKesson's claims, and that the Treaty of Amity gives McKesson a right to· recover its expropriated property. We reverse the district court's summary judgment in favor of McKesson on liability and remand for trial on the "come to the company" and futility issues. The district court's valuation of McKesson's assets and its assessment of simple interest are affirmed to the extent that those judgments are not rendered moot after trial.

*So ordered.*