IN THE SUPREME COURT OF IOWA

 No. 142 / 04-0062

 Filed February 17, 2006

STATE OF IOWA,

 Appellee,

vs.

HAROLD ARTHUR DUNCAN,

 Appellant.

 On review from the Iowa Court of Appeals.

 Appeal from the Iowa District Court for Clay County, Frank B. Nelson,
Senior Judge.

 Appeal from judgment of conviction and sentence for first-degree
murder under Iowa Code sections 707.1 and 707.2(2) (2001). DECISION OF
COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.

 Linda Del Gallo, State Appellate Defender, and David Arthur Adams,
Assistant State Appellate Defender, for appellant.

 Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant
Attorney General, Michael L. Zenor, County Attorney, and Michael J.
Houchins, Assistant County Attorney, for appellee.

LAVORATO, Chief Justice.
 A jury convicted Harold Arthur Duncan of first-degree murder. The
victim was his wife of forty-three years, Karen Kay Duncan. Following
sentencing, Harold appealed, contending the district court erred when it
admitted character and bad-acts evidence as improper rebuttal evidence. We
transferred the case to the court of appeals, which affirmed. We granted
Harold’s application for further review. On our review, we affirm the
court of appeals decision and the judgment of the district court.
 I. Background Facts.
 Harold and Karen, known as Kay, were married in December 1959. The
couple lived in a motor home parked at a trailer court in Spencer, Iowa.
Harold was retired, and Kay worked as a manager in a Subway sandwich
restaurant in Spencer.
 On January 13, 2003, Kay did not report to work at Subway. Her co-
workers became concerned, and one of them drove by the Duncans’ home where
she saw the couple’s van parked at the residence. The co-worker called a
second co-worker and they decided to ask the Duncans’ landlord to check on
Kay at the couple’s residence. The landlord received no response to her
knocks on the door, which prompted her to call the police.
 After failing to get anyone to come to the door, a Spencer city police
officer gained entrance through a window. He found Harold and Kay sprawled
out on their bed; Harold was face up and Kay was face down. Kay had been
shot twice, once to the front of her body, and once to her back. She was
pronounced dead at the scene. Harold appeared to have a serious wound to
the face but was alive. Police found a shotgun in the hallway of the motor
home. In the cockpit area of the motor home, the police found an open box
of 12-gauge shotgun shells.
 Harold was taken to a local hospital and then to a hospital in Sioux
City where a Division of Criminal Investigation (DCI) agent interviewed
him. Harold admitted shooting Kay twice and admitted shooting himself.
 Later in the day, Harold was transferred to a hospital in Omaha where
another DCI agent interviewed him. During this interview, Harold gave
conflicting stories. In the first version, Harold said he and Kay had
argued about her work schedule at the restaurant. He got the shotgun out
and as the argument got out of control, he shot her in the chest and then
as she turned around to retreat to the back of the motor home, he shot her
in the back. In the second version, Harold related that Kay had gotten the
shotgun out of a closet in the back of the motor home and he took it away
from her. He then shot her in the chest and as she retreated towards the
back of the motor home, he shot her in the back. The third version was the
same as the first. Harold also told the agent that his wife was not “going
to hold the answer to the argument” and admitted that he had attempted to
kill himself.
 II. Proceedings.
 On January 29, 2003, the State charged Harold with first-degree murder
in violation of Iowa Code sections 707.1 and 707.2 (2001). Later, Harold
filed a notice of diminished responsibility and a notice of self-defense.
 Before trial, Harold filed a stipulation with the court in which he
stated that on January 13, 2003, he fired two shots from a 12-gauge shotgun
resulting in the death of his wife, Kay. He fired one shot to her chest
and one shot to her back.
 At trial, the stipulation was read to the jury. Additionally, the
jury heard testimony regarding Harold’s admissions to the DCI agents.
Testimony also revealed that Harold had a sixth-grade education and
functioned at a range between mental retardation and below-average
intelligence.
 Harold testified as follows. Kay called him into their bedroom and
told him she wanted a divorce. At the time, Kay was lying on the bed and
pulled out a shotgun. He grabbed the shotgun and took it away. He then
grabbed her and she slid off the bed, and, as he characterized it,
“[t]hat’s when everything went wrong.” He had no recollection of what
happened after that.
 Following trial, a jury found Harold guilty of first-degree murder.
The court later sentenced Harold to life in prison.
 Harold appealed, and we transferred the case to the court of appeals.
The court of appeals affirmed. We granted Harold’s application for further
review.
 III. Issues.
 On appeal, Harold raised the following issue: Whether the district
court erred in admitting evidence of the defendant’s character and prior
bad acts as improper rebuttal evidence.
 IV. Defendant’s Character and Prior Bad Acts.
 A. The challenged evidence. The issue revolves around the cross-
examination of Harold and the subsequent rebuttal testimony of one of his
daughters. On direct examination, Harold testified about going to the bank
several days before the shooting so that Kay could open accounts in her
name and remove her name from the accounts that she jointly held with him.
Harold also testified about Kay’s discussion of divorce.
 On cross-examination of Harold, the following exchange took place
without objection:

 Q. And isn’t it true that you were shaking violently when you
 were at Northwest Federal? A. What is violently?
 Q. Shaking? A. Well, yeah. They were shaking pretty good.
 We sat there in the chair, Kay and I did, together.
 Q. And that’s because you were upset and angry with Kay because
 she was opening up her own account? A. No, sir. Mother could have
 any account she wanted. My three daughters are out here in the crowd.
 They could tell you.

 Later, during the cross-examination, the prosecutor focused on the
relationship between Harold and Kay, again without objection:

 Q. You talked about your relationship with your wife, Kay? A.
 Yes, sir.
 Q. That was an abusive relationship, wasn’t it? A. I got
 three daughters out there. I don’t think so, and I don’t think
 they’ll tell you that either. We had a wonderful time. We had a
 great big boat. We went to Lake Superior. I named the boat Lady Kay
 and we always got fish. We hunted together. My wife road hunt, so
 she would load the gun and handed it to me when we went out, and I
 would slide it out of the case and walk the ditches. We were
 together, her and I.

 Harold was then asked about hitting Kay, calling her names (such as
fat and stupid), and belittling her. He admitted striking Kay once that
left bruises, but did not recall any other time that he hit her. He denied
the name calling and belittling.
 The State presented the following rebuttal evidence, consisting of the
testimony of the Duncans’ youngest daughter:

 Q. You’ve been present during the testimony during this trial.
 Correct? A. Correct.
 Q. When your father was testifying, he said it was—that he was
 a good father, he was a good husband, and that we should just ask his
 daughters whether he was such. And you’re one of his daughters? A.
 Correct.
 . . . .
 Q. Okay. I’m going to ask you then what type of father was the
 defendant? A. My father—

 It was at this point that the defense counsel made his first
objection:

 DEFENSE COUNSEL: Hold on one second, please. Your Honor, I
 don’t mean to interrupt this young lady but the question that [the
 prosecutor] is prefacing came vis-à-vis his cross-examination, not
 something we put into evidence and, two, it’s not really relevant to
 any issue that’s framed here and it’s improper character evidence at
 this point in time.
 The Court: Well, the objection is overruled. Go ahead and
 answer the question.
 Q. What type of father was the defendant, Harold Duncan?

 The daughter then testified about Harold being an abusive alcoholic.
She said the children were abused, hit, and pushed through doors. The
prosecutor also asked the daughter how Harold treated Kay. The daughter
replied:

 My father abused my mother very badly. Many times to get us children
 to behave he would take it out on my mom if we did something wrong.
 There [were] points where there [were] incidents where one time we
 were out boating and he threatened to push her over the boat and told
 us kids when he accomplished that that we would be next.

 It was at this point that the defense counsel lodged his second
objection:

 DEFENSE COUNSEL: Your Honor, at this point again I would renew
 my objection that we’re really getting out in left field for events
 that took place forty years ago.
 The Court: We understand it was a long time ago.

The daughter testified further that an officer had explained the change in
domestic abuse laws to her father. The daughter admitted that after a
period of time, the physical abuse stopped.
 The prosecutor then sought testimony from the daughter concerning the
more recent state of affairs between Harold and Kay:

 Q. I want to move to the more current situation between your
 father and your mother. Let’s move to the last three or four years,
 two or three years prior to her death. A. Okay.
 Q. How would you describe their marital relationship? A. My
 father was very controlling of my mother. My mother was not allowed
 to drive anywhere. She did hold a driver’s license but it was for
 identification purposes only. Dad did drive her to and from work, not
 that that was really a choice, you know. My father was very
 belittling of my mother. When they would come to visit, he would not
 allow us the time alone together for fear of what we would talk about.
 He controlled the keys. He would hold the keys. If she wanted to go
 out to the van or motor home, she would have to ask him for the keys
 and return them to him as soon as she returned.
 . . . .
 Q. Were there times where the defendant actually threatened
 your mother’s life? A. Yes, there were. The boat incident I spoke
 of earlier. Also there was a time when one of my sisters was home
 with her two small children and my—it was a Christmas Eve and—
 Q. Were you present during this? A. Yes, I was. I was. It
 was Christmas Eve and my father had been drinking and had become
 violent and actually sat and pointed at us and counted how many
 bullets you would need to kill us all.

 Under cross-examination, the daughter admitted that the majority of
her comments related to situations when Harold was drunk, that he stopped
drinking in 1983 when he got treatment, and he was sober for twenty years.

 On the State’s redirect examination, the prosecutor asked the
daughter to tell the jury what type of mother Kay was. The defense counsel
objected on the ground that testimony was outside the scope of direct. The
court overruled the objection. The daughter then responded:

 My mom—When I first got the call from Terry Klooster right after this
 happened, he asked me to explain the relationship and explain my
 father, my mother. And the best way I can describe it is to know my
 mom was to love my mom, to know my dad was to tolerate my dad. My mom
 was a very loving woman, very loyal, you know. To know her was to
 love her.

 B. The parties’ contentions. Harold’s contentions are as follows.
First, the rebuttal testimony of the daughter about Harold’s failures as a
father or husband in the forty years prior to Kay’s death was not relevant
as to why Harold allegedly murdered his wife because it did not demonstrate
proof regarding any of the exceptions stated in Iowa Rule of Evidence
5.404(b). For that reason that testimony was inadmissible.
 Second, the daughter’s rebuttal evidence, though ostensibly offered to
challenge Harold’s credibility, went solely to his character. Such
evidence established Harold’s alcohol abuse; his negative, controlling
character; and his propensity for abuse. The rebuttal evidence was
entirely devoted to the demolition of Harold’s character.
 Third, the daughter’s rebuttal testimony about what a loving mother
Kay was constituted an appeal to the jury’s passions and borders on
prosecutorial misconduct.
 Last, the rebuttal evidence would normally not have been admitted
under rule 5.404(b). The prosecutor sought to “bootstrap” this evidence
under the guise of impeaching Harold’s credibility. What transpired had
all the trappings of a “setup” because in cross-examining Harold, the
prosecutor asked a question that, on its face, was bound to elicit a
response favorable to Harold so that the prosecutor could use otherwise
inadmissible evidence to impeach the self-serving response.
 The State contends that all of the challenged evidence was admissible
under rule 5.404(b) to show Harold’s intent in shooting his wife and to
rebut his claims of self-defense and diminished responsibility.
Additionally, the State contends that the evidence of Kay’s good nature was
properly admissible to rebut Harold’s claim that she was the aggressor in
the altercation. Finally, even if any of the challenged evidence was
admitted in error, the error was harmless in light of the overwhelming
evidence of Harold’s guilt.
 C. Analysis. Iowa Rule of Evidence 5.404(b) provides that

 [e]vidence of other crimes, wrongs, or acts is not admissible to prove
 the character of a person in order to show that the person acted in
 conformity therewith. It may, however, be admissible for other
 purposes, such as proof of motive, opportunity, intent, preparation,
 plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 5.404(b). The key to whether evidence of other crimes,
wrongs, or acts is admissible is whether such evidence “ ‘is relevant and
material to some legitimate issue other than a general propensity to commit
wrongful acts.’ ” State v. Plaster, 424 N.W.2d 226, 229 (Iowa 1988)
(citation omitted). On the admissibility issue, the district court employs
a two-step analysis. First, is the evidence relevant? Second, even if
relevant, does the probative value of such evidence substantially outweigh
the danger of unfair prejudice pursuant to the balancing test under Iowa
Rule of Evidence 5.403? Id.
 Here, whether there was prejudicial error requiring reversal in the
admissibility of evidence of past abuse described in the daughter’s
rebuttal testimony hinges on the issues of relevancy and prejudice. To put
the matter in context, we must understand the defense’s theory underlying
its self-defense claim, as shown in the following portion of the defense
counsel’s final argument:

 Here’s one of the things that we had as a problem in looking at
 this case. Why would Karen Duncan take a loaded shotgun to bed?
 Doesn’t make sense. I mean, people don’t normally take loaded
 shotguns to bed, do they? Not in my household. But they do if
 they’ve suffered from domestic abuse for the last forty-six years,
 don’t they? They do when she’s so fearful.
 Tammy Schwarting goes out to the trailer that morning because
 she doesn’t show up for work. They’re so fearful that the cell phone
 person . . . noted the fear in this woman. They would if—she not only
 expresses herself to Lola Wood, the Northwest Federal employee who
 changed the accounts . . . .
 And last but not least, [the Duncans’ daughter] testified. You
 heard her yesterday as to the years of abuse. You take a gun to bed
 because you know you’re going to be getting divorced and you don’t
 know how he’s going to act and you want to be protected. That’s why
 she took the loaded shotgun to bed that January 12, 2003.

 Counsel continued:

 The blood got on the gun because Mr. Duncan was already shot when he
 got control of the gun. He loaded it with another shell, shot it
 twice at his wife. The blood got on the stock because there was blood
 on his hand. . . .
 . . . .
 Now, let’s think about this a second. You’ve just had half your
 face blown off and you go down. You regain consciousness—or
 semiconsciousness. What’s your first thought? She’s in the back
 bedroom and that is where the rest of the guns are. Even though I’ve
 got this one, the other guns are back there. She’s going for another
 gun.
 . . . .
 One last thing that I haven’t touched upon is that after Harold
 was shot, Kay Duncan did pick up her cell phone. I submit to you that
 she tried to call 911 for an ambulance. That is why when they found
 her body, she was holding the cell phone.
 What happens when somebody is injured? She wasn’t running out
 of the place. She was trying to call for an ambulance for her husband
 who just had half of his face blown off. She never got that call made
 because she was shot then.

 As one can see, Harold’s self-defense claim is very simple. Kay
takes the shotgun to bed to defend herself against Harold in the event he
reacts violently, as he has in the past, to the news of her decision to
seek a divorce. Kay shoots Harold first. Then in fear of being shot
again, Harold takes the gun away from Kay and shoots her. What fuels the
defense is Harold’s past abuse which causes Kay to fear Harold and induces
her to get him before he gets her.
 The above excerpts from the defense counsel’s final argument and the
following discussion show that counsel began laying the foundation for this
abuse-induced fear beginning with voir dire, continuing with opening
statement and cross-examination of some of the State’s witnesses, and
culminating with counsel’s explanation of the self-defense claim.
 In voir dire, the defense counsel mentioned Harold’s abuse several
times:

 [T]here is going to be some testimony of possible—some domestic abuse
 in this household, some bad things there. Even though that person
 has, or what you may learn or believe at the end of the case, has a
 history of that or that the victim had gone through a period of time
 of that, being abused, do you feel that the person [is] still entitled
 to the self-defense protection under the law and if the circumstances
 weren’t, they have the right even though in the past they may have
 been a no good SOB but under those circumstances they still have the
 right to protect themselves?
 . . . .
 . . . [Y]ou’re going to hear about domestic violence and abuse,
 things of that nature. Are you going to be able to say, “Yeah, I know
 he may not have been the best person in the world but he’s still
 entitled to this self-defense protection under our laws”?
 . . . .
 . . . That is the guy. I know he’s a bad person and I know he’s
 done things probably not in retrospect happy about today in looking
 back, but he’s still entitled to that self-defense . . . .
 . . . .
 . . . [O]ne of the things that you’re going to hear, there is
 going to be some maybe bad things about Mr. Duncan. . . . [A]re you
 going to be able to say, even though he may not be the type of person
 I like, he is still entitled to the self-defense protection under Iowa
 law?
 . . . .
 . . . [T]here is going to be some testimony in the case about
 domestic abuse. If the Court directs you that, even though there is
 domestic abuse out there, that Mr. Duncan’s entitled to the defense of
 self-defense even though he may be a bad person, do you think you
 could follow that?
 . . . .
 . . . There is going to be evidence that domestic abuse—that’s
 going to come out in this case. You understand, even though you may
 not like Mr. Duncan at the end of this case, you may think he’s—you
 may not find him to be a good person. Even though you don’t like him,
 you don’t like the things he’s done, he’s still entitled to the
 defense under the law of self-defense.

 In final argument, the defense counsel reminded the jurors about what
he had said in his opening statement concerning the abuse:

 Last but not least, we have [the Duncans’ daughter’s testimony].
 She testified about the years of abuse. If you recall my opening
 statement to you, I told you that these events were the culmination of
 a marriage which was marked with abuse.

 In his cross-examination of three of the State’s witnesses, the
defense counsel attempted to plant the seed of the theory underlying the
self-defense claim by emphasizing Kay’s fear of Harold. Tammy Schwarting,
one of Kay’s co-workers, testifying for the State without objection,
described the relationship between Harold and Kay as “different at
different times. There [were] times where it was very good, and then there
[were] times that it was very rocky. But as long as it was Harold’s way,
it would be okay.” On occasion, according to this witness, Harold would
belittle Kay by calling her “fat” and “stupid.”
 On the defense counsel’s cross-examination of Schwarting, there was
this exchange:

 Q. And, in fact, when you and I previously met last April, you
 characterized their relationship was one in which you indicated that
 she kind of had to walk on eggshells? A. Yes, she did.
 Q. Their relationship became more tense as the months
 progressed prior to the time of her death. Correct? A. Yes.
 . . . .
 Q. But there is no question whatsoever in your mind that she
 became fearful of Harold Duncan? A. I did not say she was fearful of
 Harold.
 Q. All right. You said she walked on eggshells? A. Yes, I
 did.
 Q. What did you mean by that? A. She just had to be very
 careful of what she did. . . .
 . . . .
 Q. Karen Duncan did not appear for work the 13th. . . . A.
 No, she did not.
 Q. And that gave you great concern? A. Yes, it did.
 Q. What specifically was your concern? A. I was scared that
 something had happened to Kay.
 . . . .
 Q. Did you ever indicate to Officer Lawson or Officer Warburton
 that you thought Harold may have harmed her? A. I may have said, yes,
 he could have hurt her.

 The State offered two other witnesses, Pamela Santage and Lola Wood,
who had seen and talked with Kay several days before her death. Santage,
an employee of a local cell phone company, testified that she had sold Kay
and Harold a cell phone some time before the events in question. She also
testified that three days before Kay’s death she sold Kay a cell phone.
Santage related that Kay was upset and appeared to have been crying.
Santage further related that Kay said she needed a cell phone to keep in
contact with her place of employment, that Harold would not let her use the
phone they had, that she could not believe she had been so stupid so long
and she was not going to be with him anymore, and that Harold was worse
than he had ever been. This testimony too came in without objection.
 The defense counsel’s cross-examination of this witness was very short
and again emphasized Kay’s fear of Harold:

 Q. But there was a marked difference on the 10th day of January
 2003, when she came in to see you, wasn’t there? A. Yes. She was
 very upset.
 Q. Fearful? A. I think so, in some respect.

 And finally, Wood, a bank employee, described without objection her
meeting with Harold and Kay at a local bank in Spencer on the same day.
Wood testified that Kay wanted to be taken off of the joint account with
Harold. Wood testified that Kay was sad while Harold was shaking violently
the whole time during the transaction.
 The defense counsel’s cross-examination of this witness was likewise
very short, resulting in this exchange in which counsel again emphasized
Kay’s fear of Harold:

 Q. I take it you felt she was in distress? A. Yes, I did.
 Q. Distress, the fear was pretty heightened, wasn’t it? A. Yes,
 it was, sir.
 Q. About as high as you can get when you, recognizing that
 stress, instead of shaking her hand, wanted to give her some comfort
 by patting her back— A. Yes.
 Q. —and hugging her. Am I right? A. Yes.

 On cross-examination of the State’s firearms expert, the defense
counsel obtained a concession that the expert could not determine whether
Harold or Kay was shot first. This concession of course was important to
the defense’s theory underlying its self-defense claim.
 So it is clear that beginning with voir dire, the defense counsel was
relying on Harold’s past abuse of Kay to support the defense’s theory that
fear moved Kay to be the aggressor in a violent confrontation that
culminated in her death. Later, in his final argument, the defense counsel
made clear how the past abuse-induced fear was relevant to the theory
underlying the self-defense claim.
 It would be strange indeed for us to allow Harold to use what he now
contends is irrelevant and prejudicial evidence to support this theory of
self-defense and following an unfavorable verdict allow him to urge
reversal on appeal based on the same evidence. He cannot have it both
ways. He may not do so because of the rule commonly referred to as
judicial estoppel but more accurately referred to as preclusion of
inconsistent positions. See 18B Charles Alan Wright, Arthur R. Miller &
Edward H. Cooper, Federal Practice and Procedure § 4477, at 549 (2d ed.
2002); Vennerberg Farms, Inc. v. IGF Ins. Co., 405 N.W.2d 810, 814 (Iowa
1987).
 In Snouffer & Ford v. City of Tipton, this court described the
doctrine of judicial estoppel against inconsistent positions this way: “A
party who has, with knowledge of the facts, assumed a particular position
in judicial proceedings is estopped to assume a position inconsistent
therewith to the prejudice of the adverse party.” 150 Iowa 73, 84-85, 129
N.W. 345, 350 (1911). The court explained the rationale for the doctrine:

 If [taking inconsistent positions] were permissible, there would be no
 end of litigation, for with every defeat a party might change his
 ground, mend his hold, and proceed indefinitely. Some courts have
 said that to take advantage of this rule the party to be estopped must
 be successful on his original claim. This is true in some cases, but
 this rule is not applicable here . . . .

Id. at 86, 129 N.W. at 350.
 More recently, we have described the doctrine as a “ ‘common sense’
rule, designed to protect the integrity of the judicial process by
preventing deliberately inconsistent—and potentially misleading—assertions
from being successfully urged in succeeding tribunals.” Wilson v. Liberty
Mut. Group, 666 N.W.2d 163, 166 (Iowa 2003) (citation omitted); see also
Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 23 (1st Cir. 1998) (“We
generally will not permit litigants to assert contradictory positions at
different stages of a lawsuit in order to advance their interests.”).
Because the doctrine is intended to protect the courts rather than the
litigants, an appellate court may raise estoppel on its own motion. In re
Cassidy, 892 F.2d 637, 641 (7th Cir. 1990).
 Courts have applied the doctrine to bar a person from relying in the
same proceeding upon evidence that the person has brought into the case and
then later assails it. 28 Am. Jur. 2d Estoppel and Waiver § 79, at 504
(2000). In Pace v. Assessor of Islip, 682 N.Y.S.2d 447, 450-51 (N.Y. App.
Div. 1998), a homeowner who relied on a residential assessment ratio to
prove full market value of his property in the lower tribunal could not
thereafter on appeal take a position impeaching this value. In McKesson
HBOC, Inc. v. Islamic Republic of Iran, 271 F.3d 1101, 1110-11 (D.C. Cir.
2001), vacated in part on other grounds, 320 F.3d 280, 281 (D.C. Cir. 2003)
(per curiam), the appellate court barred a party from claiming the trial
court erred because it used the wrong exchange rate in calculating the
amount of an award when the party’s own expert used the same exchange rate.
 And in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533, 1540
(11th Cir. 1993), the appellate court barred a party from claiming the
trial court erred in submitting the question of how interest was to be
calculated when the party agreed on three alternatives, one of which the
jury chose.
 Here, it is clear from the defense counsel’s voir dire and opening
statement that not only was the jury aware of Harold’s past abuse but they
were also expecting such testimony. Moreover, the defense counsel painted
Harold as a bad person who nevertheless was entitled to the defense of self-
defense under the law. And then the jury learns in the defense counsel’s
final argument why evidence of Harold’s past abuse and bad character was
relevant to his defense. The defense counsel used the daughter’s rebuttal
testimony to Harold’s advantage by noting that there were years of abuse.
In effect, the defense counsel invited what Harold now complains was error.

 We have not overlooked the fact that the defense counsel objected to
the daughter’s rebuttal testimony. Ordinarily a defendant does not waive
error by referring to evidence that the defendant has unsuccessfully
challenged. For example, in State v. Jones, the district court overruled a
pretrial defense motion to prohibit the State from using the defendant’s
prior conviction for impeachment purposes on cross-examination. 271 N.W.2d
761, 765 (Iowa 1978). During trial, the defense counsel brought out the
defendant’s conviction during direct examination of the defendant. Id.
This court held that when

 the issue is fully argued and trial court, carefully apprised of
 defendant’s objection, rules evidence of prior convictions admissible,
 we are not convinced defendant must abandon all trial tactics to
 preserve error. We hold defendant has not waived his right to assert
 error in this instance.
Id. at 766.
 In contrast to Jones, the defense counsel here never challenged
evidence of past abuse before the daughter’s rebuttal testimony. To the
contrary, the defense counsel from voir dire on made it very clear to the
jury that there would be such evidence. Moreover, the defense counsel in
Jones was attempting to take the sting out of the prior conviction
evidence. In contrast, the defense counsel here was taking advantage of
the past abuse evidence to support the defense theory underlying the claim
of self-defense. The trial strategies were therefore entirely different.
Under these circumstances, we think Harold waived error regarding the
rebuttal testimony. Moreover, we think the defense counsel’s objection to
the rebuttal testimony was apparently an attempt to preserve error in the
event the defense counsel’s strategy did not work. But, as we have said,
Harold cannot have it both ways. To reverse this case on the grounds that
Harold now urges would not only be prejudicial to the State but would also
encroach upon the integrity of the judicial process.
 In fairness to the appellate counsel, we must point out that he was
not the trial counsel. It is clear to us the appellate counsel had no
choice but to take a position inconsistent with the position the trial
counsel took. At the same time, we are not criticizing the trial counsel’s
strategy. Given the overwhelming physical evidence of guilt coupled with
Harold’s admissions, this was Harold’s best chance for acquittal.
 As to the claimed setup, we reject it out of hand because we are
convinced there was no setup. In State v. Werts, we described the
prosecutor’s cross-examination of the defendant and a rebuttal witness’s
testimony as having “all the attributes of a setup.” 677 N.W.2d 734, 737
(Iowa 2004). By that we meant that “[i]n cross-examining the defendant,
the prosecutor asked a question that, on its face, was bound to elicit a
response favorable to defendant so that he could use otherwise inadmissible
evidence to impeach the self-serving response.” Id.
 Here, everyone in the case was well-aware of Harold’s past abuse. The
defense counsel had talked about it in voir dire and opening statement. And
several defense witnesses had also talked about it. So the question, “That
was an abusive relationship, wasn’t it?” was not on its face bound to
elicit a favorable response. Given what went on before, we think the
prosecutor as well as the defense counsel and jury were caught off guard by
Harold’s response. Because of Harold’s low intelligence, he probably was
not in tune with the defense counsel’s reasons for wanting the abuse in
evidence.
 We also find no basis for reversal based on Harold’s contention that
the daughter’s description of her mother as a loving person constituted an
appeal to the jury’s passion and borders on prosecutorial misconduct.
Because no such objection was made to this testimony, the claimed error was
not preserved. Iowa R. Evid. 5.103(a)(1); State v. Martin, 704 N.W.2d 665,
669 (Iowa 2005). Moreover, the testimony was cumulative because other
witnesses had already given similar testimony without objection. See
Swartzendruber v. Lamb, 582 N.W.2d 171, 175-76 (Iowa 1998) (concluding
inquiries and responses “were not sufficiently prejudicial to warrant a
reversal of the judgment” because “[s]everal responses were cumulative of
other evidence received without objection”); State v. McCurry, 544 N.W.2d
444, 448 (Iowa 1996) (holding district court did not err in admitting
reports that “were merely cumulative of evidence already in the record”).
 V. Disposition.
 During trial, Harold relied on evidence of his past abuse to support
his claim of self-defense. He cannot now on appeal urge reversal on the
grounds that such evidence was irrelevant and prejudicial. Moreover, we
are not convinced there was a setup by the prosecutor. Finally, we find no
reversible error based on Harold’s contention that the daughter’s
description of her mother constituted an appeal to the jury’s passion and
borders on prosecutorial misconduct. Error was not preserved on this
ground. In any event, such evidence was cumulative. For all these
reasons, we affirm the court of appeals decision and the district court’s
judgment of conviction and sentence.
 DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.